STATE, ex rel. EATON, Appellant, v. PRICE, Chief of Police.

Supreme Court of the United States.

No. 30. Decided June 27, 1960.

Mr. Greene Chandler Furman and Mr. Elbert E. Blakely, for appellant.

Mr. Charles S. Rhyne, and Mr. Joseph P. Duffy, for appellee.

50

Justice Stewart took no part in the consideration or decision of this case.

Justice Brennan, with whom the chief justice, Justice Black, and Justice Douglas join.

 For further history see *Omnibus Index* in bound volume.

*Per Curiam.* The judgment of the Ohio Supreme Court in this case is being affirmed *ex necessitate*, by an equally divided court. Four of the Justices participating are of opinion that the judgment should be affirmed, while we four think it should be reversed. Accordingly, the judgment is without force as precedent. The Antelope, 10 Wheat. 66, 126, 6 L. Ed., 268; *Etting* v. *Bank of the United States,* 11 Wheat., 59, 78, 6 L. Ed., 419. In such circumstances, as those leading cases indicate, the usual practice is not to express any opinion, for such an expression is unnecessary where nothing is settled. But in this case even before the cause was argued, four justices made public record of their votes to affirm the judgment, and their basis therefor. 360 U. S., 246, 248-249, 79 S. Ct., 978, 979, 3 L. Ed. (2d), 1200. These four justices stated that they were ''of the view that this case is controlled by, and should be affirmed on the authority of *Frank* v. *State of Maryland,* 359 U. S., 360, 79 S. Ct., 804 [3 L. Ed. (2d), 877].'' Their opinion further states that they deemed ''the decision in the Maryland case to be completely controlling upon the Ohio decision.'' In a longer opinion, one of the four justices developed his views on the merits further. 360 U. S., at pages 249-250, 79 S. Ct. at pages 979-980. The usual practice of not expressing opinions upon an equal division has the salutary force of preventing the identification of the Justices holding the differing views as to the issue, and this may well enable the next case presenting it to be approached with less commitment. But the action we have

described prevents this from being the case here; and so the reason for the usual practice is not applicable. Accordingly, since argument has been had, and votes on the merits are now in order, we express our opinion.[1]

This case involves Earl Taylor, who is in his sixties and has been working at his trade of plumber for 40 years, and the home at 130 Henry Street, in Dayton, Ohio, which he and his wife bought and in which they have lived for over a decade. He describes it as a little cottage, all on one floor, with a front room and a middle room, two bedrooms, a dining room and a little utility room, and a bathroom and little kitchen at the back. What was evidently Taylor's first involvement with the criminal law occurred in this fashion. One day three men who were housing inspectors came to his door, and said they wanted to come in the house and go through the house and inspect the inside of the house. They had no credentials, only a sheet of yellow note paper, and Taylor said to them, "You have nothing to show me you have got a right to go through my house." The response was "We don't have ·to have, according to the law passed four years ago."[2] Replied Taylor, "That don't show

---

1. Expressions of views, despite equal divisions, have been made before where there was a question whether one fact situation was to be distinguished from a related one on which a majority of the court had rendered an opinion. RALEY v. OHIO, 360 U. S. 423, 440-442, 442-445, 79 S. Ct. 1257, 1267-1268, 1268-1270. The question whether this case is to be distinguished from FRANK presents analogy to this.

2. The reference is apparently to the ordinance around which this case turns. Section 806-30(a) of the Dayton, Ohio, Code of General Ordinances provides:

"The Housing Inspector is hereby authorized and directed to make inspections to determine the condition of dwellings, dwelling units, rooming houses, rooming units and premises located within the City of Dayton in order that he may perform his duty of safeguarding the health and safety of the occupants of dwellings and of the general public. For the purpose of making such inspections and upon showing appropriate identification the housing inspector is hereby authorized to enter, examine and survey at any reasonable hour all dwellings, dwelling· units, rooming houses, rooming units, and premises. The owner or occupant of every dwelling, dwelling unit, rooming house, and rooming unit or the person in charge thereof, shall give the housing inspector free access to such dwelling, dwelling unit, rooming house or rooming unit and its premises at any reasonable hour for the purpose of such inspection, examination and survey."

me that you got anything in there that you want for inspection, and, further, I don't have nothing in my house that has to be inspected." The man said, "Well, you know, according to this ordinance, that we got a right to go through your house and inspect your house." "No, I don't think you have, unless you got a search warrant," answered Taylor. This has been his position ever since, and it is the issue that divides us.

The men went away, but later there was a second attempt to gain access to Taylor's house, and a telephone call to the same end. Taylor said, "I don't see what right that you got coming into my house. Until you show me in writing, or some kind of facts, that you got a right to come into my house and inspect the house, I will not let you in." The third time the men came, there were two of them. One had some sort of credential with a photo on it. Neither had a warrant of any kind. One said the housing inspector wanted to inspect Taylor's house. Taylor said, "What do you have in there that you want to inspect? I have nothing in my house for inspection." He was told: "We have a right to come in your house, go through your house, inspect the whole inside of your house." Taylor's reaction to this was: "You have nothing wrote down on paper. You don't have a thing to show me you are going to come in there to inspect anything, and as far as that goes you aren't coming in unless you have a search warrant to get in." The men never came back with a search warrant, but as they left, one said, "If you ain't going to let us in, we are entitled to get in, and if you don't let us in, I am going to leave it up to the prosecutor." Whereupon Taylor said: "I don't care what you do. You aren't coming in." Taylor later testified that then the man "walked over and got in his car and that was the end of it."

But it was not. Taylor and his wife each received through the mail a registered letter from the city prosecutor, notifying them to appear at his office to answer a complaint against them.

---

This command is backed by the penalty that "Any person who shall violate any provision of this ordinance shall, upon conviction, be punished by a fine of not less than twenty dollars ($20.00) nor more than two hundred dollars ($200) or by imprisonment of not less than two (2) days nor more than thirty (30) days, or both, and each day of failure to comply with any such provision shall constitute a separate violation." §806-83.

They did not appear; whereupon the police came to Taylor's home, and finally served him with a warrant—a warrant to appear in court to answer criminal charges brought against him for failing to admit the inspectors to his home. He appeared in court and was held for trial; and not being then able to make bond of $1,000, he was committed to jail, to await trial on the charges, which could have resulted in a fine of $200 and an incarceration of 30 days for each day's recalcitrance. One Eaton, an attorney, filed a petition for habeas corpus on Taylor's behalf in the state common pleas court.[3] The common pleas court found the ordinance unconstitutional and discharged Taylor from custody; but the court of appeals reversed, 105 Ohio App., 376, 6 Ohio Opinions (2d), 153, 152 N. E. (2d), 776, and its judgment was upheld by the Ohio Supreme Court. 168 Ohio St., 123, 5 Ohio Opinions (2d), 377, 151 N. E. (2d), 523. We noted probable jurisdiction. 360 U. S., 246, 79 S. Ct., 978, 3 L. Ed. (2d), 1200.

The municipal ordinance in question provides numerous requirements for dwellings, deemed by the city to be appropriate in the interests of the public health, safety and comfort. Several of the requirements apply to private dwelling houses, such as the Taylors.' None of these requirements is at all questioned here. What is questioned is the ordinance provision, Code of General Ordinances Section 860-30, authorizing the Housing Inspector to enter at any reasonable hour any dwelling whatsoever and commanding the owner or occupant to give him free access at any reasonable hour for the purpose of his inspection. It was armed with the naked authority of this provision, and not with any warrant (the ordinance provides for none) that the inspectors approached Taylor's door, even after he had made clear to them his intent not

3. Evidently habeas corpus lies in Ohio to test the constitutionality of the ordinance under which one is being held through charges pending in a court of inferior jurisdiction, as all the state courts proceeded to pass on the merits of the claims of the relator Eaton, appellant here, that the ordinance under which the charges were brought infringed Taylor's constitutional rights. Accordingly, we may now review that determination on the merits, the habeas corpus proceeding, independent of the criminal prosecution itself, having proceeded to a final judgment. NEW YORK ex rel. BRYANT v. ZIMMERMAN, 278 U. S. 63, 70, 49 S. Ct. 61, 64, 73 L. Ed. 184.

to admit them on this basis. Neither before a magistrate empowered to issue warrants, nor in this proceeding, have the inspectors offered any justification for their entry. They have not shown any probable cause for grounds to believe that a proscribed condition existed within the cottage, or even that they had suspicion or complaint thereof. They have not shown that they desired to make the inspection in pursuance of a regular, routinized spot check of individual homes, or in pursuance of a planned blanket check of all the homes in a particular neighborhood, or the like.[4] These might be said to be the usual reasons which would impel inspectors to seek to gain admittance to a private dwelling; but none of them is shown by the record to have been present. Most significantly, on the initial recalcitrance of Taylor, the inspectors were not required to, and did not, repair before any independent magistrate to demonstrate to him their reasons for wanting to gain access to Taylor's cottage, and to obtain his warrant for their entry —the authorization on which Taylor was insisting. The judgment below is, on this record, bottomed on the proposition that the inspectors have the right to enter a private dwelling, and the householder can be bound under criminal penalties to admit them, though there is demonstration neither of reason to believe there exists an improper condition within the dwelling, nor of the existence of any plan of inspection, apart from such a belief, which would include the inspection of the dwelling in question. We think that affirmance of this judgment would reduce the protection of the householder "against unreasonable searchers" to the vanishing point.

In support of the judgment below, much reliance at the bar has been put on *Frank* v. *Maryland*, 359 U. S., 360, 79 S. Ct., 804, 3 L. Ed. (2d), 877. We would not be candid to say that on its own facts we have become reconciled to that judgment. To us, it remains "the dubious pronouncement of a gravely divided Court." *Cooper* v. *Aaron*, 358 U. S., 1, 24, 78 S. Ct.,

---

4. Those desiring to make the inspection did not so testify; and such a planned blanket check, or its nature, are hardly inferable from Taylor's statement that "they had been going up and down there, door-to-door, looking through everybody's houses," the only thing resembling evidence on the point.

1401, 1413, 3 L. Ed. (2d), 5, 19 (concurring opinion). "A single decision by a closely divided court, unsupported by the confirmation of time cannot check" the course of constitutional adjudication here. See *Kovacs* v. *Cooper*, 336 U. S., 77, 89, 69 S. Ct., 448, 454, 455, 93 L. Ed., 513 (concurring opinion). We continue to go with Judge Prettyman in *District of Columbia* v. *Little*, 85 U. S. App. D. C., 242, 178 F. (2d), 13, 17, 13 A. L. R. (2d), 954, affirmed on other grounds, 339 U. S., 1, 70 S. Ct., 468, 94 L. Ed., 599, that: "To say that a man suspected of crime has a right to protection against search of his home without a warrant, but that a man not suspected of crime has no such protection, is a fantastic absurdity." Nothing demonstrated in the Frank case indicates otherwise to us. But the present case goes much further than Frank; and as to the reasonableness of searches, it has been stressed that factual differences may weigh heavily. *Go-Bart Importing Co.* v. *United States*, 282 U. S., 344, 357, 51 S. Ct., 153, 158, 75 L. Ed., 374. The search in Frank was for the nesting place of rats. There were ample grounds on the part of the inspecting officer to believe its existence in the house. There had been complaint of rats in the neighborhood; and an external inspection of the house in question revealed that it was "in an 'extreme state of decay'" and that behind it there was a pile of "rodent feces mixed with straw and trash and debris to approximately half a ton." See 359 U. S. at page 361, 79 S. Ct. at page 806. The case was decided by the narrowest of divisions; and one member of the majority found it necessary to express in a concurring opinion that the sole purpose of the search was an attempt "to locate the habitat of disease-carrying rodents known to be somewhere in the immediate area." 359 U. S., at page 373, 79 S. Ct. at page 812. There was no case of a "systematic area-by-area search" before the court, and although certain remarks were made as applicable to such a search, 359 U. S. at page 372, 79 S. Ct. at page 811, their character as dicta is patent. Thus, even accepting the judgment in Frank of such expressions the classic language of Justice Brandeis, dissenting in *Jaybird Mining Co.* v. *Weir*, 271 U. S., 609, 619, 46 S. Ct., 592, 595, 70 L. Ed., 1112, can be said again: "It is a peculiar virtue of our system of law that the process of inclusion and exclusion,

so often employed in developing a rule, is not allowed to end with its enunciation and that an expression in an opinion yields later to the impact of facts unforeseen.''

In this case we pass beyond the situation in Frank, where the inspector was looking for a specific violation, and where he had, and was able to demonstrate, considerable grounds to believe it existed in Frank's house. Here it would appear from Taylor's testimony that, even without a warrant, if a specific matter was cited to him by the inspector, he would have permitted the inspection in that regard. On the contrary, Frank's denial of access was described as based on ''a rarely voiced denial of any official justification for seeking to enter his home.'' 359 U. S., at page 366, 79 S. Ct., at page 808. There then was a specific demand for inspection, met by a refusal on the broadest of grounds. Here we have the most general of demands, supported here by no particularized justification, either directed at the conditions in Taylor's cottage, or in terms of some over-all systematic plan which would include it. This is met not by an attitude of defiance, but by a request by the householder that a specific authorization be furnished him. Not a search warrant, but a criminal complaint is the upshot. We would grossly tone down the protections afforded the householder by the Constitution were we to put an authoritative sanction on the judgment that condemns his refusal.

Much argument is made of the need of the authorities to perform inspections on a ''spot check'' or on an area-by-area basis. The judgment below cannot be said to present this problem, because there was no evidence that this in fact was what was being done; that the inspectors in fact were proceeding according to a reasonable plan of one sort or another. For all that appears here, the inspectors could have been acting in accordance with no particular plan of spot checks or area-by-area searches which could be justified as ''reasonable,'' and which would give probable cause for entry; their action could have been based on caprice or on personal or political spite. It hardly contradicts experience to suggest that the practical administration of local government in this country can be in-

---

5. See FRANK v. MARYLAND, SUPRA, 359 U. S. at page 383, 79 S. Ct. at page 817 (dissenting opinion).

fected with such motives. Building inspection ordinances can lend themselves readily to such abuse. We do not at all say this to be the case here, and Taylor has made no proof of it, to be sure; but that simply points up the issue. The inspectors have not been required to make any justification for their entry. The judgment below upholds the charges as sufficient as based on a demand for entry without any such justification.

But if we were to assume that the inspectors were proceeding according to a plan, and even if evidence of the plan were put in at the trial, we think that the result should be the same. The time to make such justification is not in the criminal proceeding, after the householder has acted at his peril in denying access. The time to make it is in advance of prosecution, and the place before a magistrate empowered to issue warrants, which will put the seal of legitimacy—the seal the Constitution specifically provides for—on the demand of the inspector, if indeed it is a reasonable one. Such a warrant need not be sought except where the householder does not consent. This is precisely the procedure followed by England in this particular area, see Public Health Act, 1936, 26 Geo. 5, & 1 Edw. 8, c. 49, Section 287 (2);[6] and no complaint is heard that this stultifies enforcement thereof the regulation of the public health and safety. Certainly with this procedure available the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment, see *McDonald* v. *United States*, 335 U. S., 451, 455—456, 69 S. Ct., 191, 193, 93 L. Ed., 153—there is no need to be satisfied with lesser standards in this area. Cf. *Dean Milk Co.* v. *Madison*, 340 U. S., 349, 71 S. Ct., 295, 95 L.

6. The procedure cited is that prescribed by statute in the case of health inspections under the Public Health Act. There are other statutes providing for other inspections, an English commentator points out, which do not contain this safeguard. See Waters, Rights of Entry in Administrative Officers, 27 U. of Chi. L. Rev. 79, 85. Accordingly, "the private occupier is faced with a bewildering number of persons claiming a variety of rights." Id., at 83. The author is in favor of the Public Health Act procedure, and regrets that "the consistent application to good works is yet lacking." "The object should be the creation of warrant provisions in a statutory code of powers of entry, guaranteeing to the individual thereby the impartial, if rarely invoked, judgment by magistrates of the fairness and legality of any attempted entry." Id., at 93.

58

Ed., 329. The public interest in the cleanliness and adequacy of the dwellings of the people is great. So too is the public interest that the tools of counterfeiting and the paraphernalia of the illicit narcotics traffic not remain active. On an adequate and appropriate showing in particular cases, the privacy of the home must bow before these interests of the public. But none of these interests provides an open sesame to those who enforce them. The Fourth Amendment's procedure establishes the way in which these general public interests are to be brought into specific focus to require the individual householder to open his door.

It has been suggested that if the Fourth Amendment's requirement of a search warrant is acknowledged to be applicable here, the result will be a general wateringdown of the standards for the issuance of search warrants. For it is said that since it is agreed that a warrant for a health and safety inspection can be made on a showing quite different in kind from that which would, for example, justify a search for narcotics, magistrates will become lax generally in issuing warrants. The suggested preventive for this laxity is a drastic one: dispense with warrants for these inspections. We cannot believe that here it is necessary thus to burn down the house to roast the pig. To be sure, the showing that will justify a housing inspection to check compliance with health and safety regulations is different from that which would justify a search for narcotics. But we should not assume that magistrates will become so obtuse as to bear this in mind. Search warrants to look for counterfeiting equipment, for example, are not issued on a showing of probable cause to believe the existence of an untaxed still. To each specific warrant, an appropriate specific showing is necessary. This can scarcely be thought to tax the capacities of the magistrate. And of course where the rule prevails that evidence obtained in violation of the constitutional guarantee is not admissible, there will be judicial review of the magistrate's action if the fruits of a search are tendered in evidence.[7]

Apart from the very significant factual distinctions pre-

_____

7. See WEEKS v. UNITED STATES, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652.

sented by this case from the Frank case, there is another reason why we would reverse the judgment here. It has now become clear that the Frank decision may have turned in substantial part on the posting of a distinction between the affirmative guaranty of privacy against official incursion raised by the Fourth Amendment against federal action, and that raised by the Due Process Clause of the Fourteenth against state action. The concurring opinion of one of the majority in that sharply divided decision indicates some concern in that respect. 359 U. S., at page 373, 79 S. Ct., at page 812. After the greatest consideration, this court in *Wolf* v. *Colorado*, 338 U. S., 25, 27, 69 S. Ct., 1359, 1361, 93 L. Ed., 1782, declared: "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society. It is therefore implicit in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause." It is now clear that part of the majority of the court in the Frank case does not subscribe to the clear import of that statement. *Elkins* v. *United States*, 362 U. S.—, 80 S. Ct. 1453 (dissenting opinion). But the Wolf statement continues to be the ruling doctrine in this court. *Elkins* v. *United States*, 362 U. S.— (80 S. Ct., 1437). The guarantees are of the same dimension, matters of enforcement, such as the exclusionary rule, aside.

The classic debate on the import of the Fourteenth Amendment's Due Process Clause as to the applicability of the Bill of Rights to the States, we submit, does not even involve the theory that the matter is one for the judges to solve on an ad hoc basis, according to their over-all reaction to particular cases. Some of us have expressed the conviction that the preferable view of the Fourteenth Amendment is that it makes the guarantees of the Bill of Rights generally enforceable against the States. See *Adamson* v. *California*, 332 U. S., 46, 68, 67 S. Ct., 1672, 1684, 91 L. Ed., 1903 (dissenting opinion). But to them, as well as to us, who have neither accepted nor rejected that view, it is clear that the celebrated passage of Justice Cardozo's opinion in *Palka* v. *Connecticut*, 302 U. S., 319, 323-325, 58 S. Ct., 149, 150-152, 82 L. Ed., 288, can have no common ground with the view of the Wolf case that a minority

of the court now expounds. And see *Adamson* v. *California, supra,* 332 U. S., at pages 85-86, 89, 67 S. Ct., at pages 1693-1694, 1695 (dissenting opinion). For the Palko opinion refers to "a process of absorption," 302 U. S., at page 326, 58 S. Ct., at page 152, of specific Bill of Rights guarantees in the Fourteenth Amendment's standard.[8] It is not a license to the judiciary to administer a watered-down, subjective version of the individual guarantees of the Bill of Rights when state cases come before us. To be sure, the contrary view has been urged, occasionally with success; the right to counsel was put on an *ad hoc* basis, *Betts* v. *Brady,* 316 U. S., 455, 62 S. Ct., 1252, 86 L. Ed., 1595, despite what seems the clear implication to the contrary in Palko, 302 U. S., at page 324, 58 S. Ct., at page 151; and recently the surprising suggestion has even been made (never by the court) that the freedom of speech and of the press may be secured by the Fourteenth Amendment with less vigor than it is secured by the First. See *Beauharnais* v. *Illinois,* 343 U. S., 250, 288, 72 S. Ct., 725, 746, 96 L. Ed., 919 (dissenting opinion); *Roth* v. *United States,* 354 U. S., 476, 505-506, 77 S. Ct., 1304, 1319-1320, 1 L. Ed. (2d), 1498 (separate opinion); *Smith* v. *California,* 361 U. S., 147, 169, 80 S. Ct., 215, 227, 4 L. Ed. (2d), 205 (separate opinion).[9]

8. "We reach a different plane of social and moral values when we pass to the privileges and immunities that have been taken over from the earlier articles of the Federal Bill of Rights and brought within the Fourteenth Amendment by a process of absorption. These in their origin were effective against the federal government alone. If the Fourteenth Amendment has absorbed them, the process of absorption has had its source in the belief that neither liberty nor justice would exist if they were sacrificed. * * * This is true, for illustration, of freedom of thought and speech. Of that freedom one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom * * *." 302 U. S., at pages 326-327, 58 S. Ct. at page 152.

9. Contrast the statement in Palko, 302 U. S., at page 324, 58 S. Ct. at page 151. For the latest of many reiterations of the settled doctrine that the First Amendment's guarantees obtain against the States, see SMITH v. CALIFORNIA, 361 U. S. 147, 149-150, 80 S. Ct. 215, 216-217, 4 L. Ed. (2d), 205; BATES v. LITTLE ROCK, 361 U. S. 516, 522-523, 80 S. Ct. 412, 416, 4 L. Ed. (2d), 480. See STAUB v. BAXLEY, 355 U. S. 313, 321, 78 S. Ct. 277, 281, 2 L. Ed. (2d), 302. For a collection of many of the cases to this effect, see SPEISER v RANDALL, 357 U. S. 513, 530, 78 S. Ct. 1332, 1352, 2 L. Ed. (2d), 1460 (concurring opinion).

In Elkins today we have rejected such a view of the affirmative guarantees of the Fourth Amendment. The opinion of the court in Frank is very likely a product of such a rejected approach. For that reason, even if it were on all fours with the present case, it should not be followed, and the judgment below should be reversed.