COMMONWEALTH *vs.* LEWIS F. HADLEY.

Middlesex.     November 7, 1966. — December 2, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Public Health. Real Property,* Health inspection. *Constitutional Law,* Health inspection of property.

Where an inspection of certain premises pursuant to a regulation providing for such inspections, duly promulgated in the interest of the public health by the State Department of Public Health under statutory authority, was sought by a health inspector at a reasonable time, as required by the regulation, and with due regard to the convenience of the occupant of the premises and did not appear to be sought for a purpose unrelated to the public health or without proper authority or to be arbitrary or discriminatory or designed to harass the occupant, it was held that, although the inspector had no specific complaint respecting the premises and had no warrant to enter them, the occupant, upon refusing to permit the inspection in violation of a provision of the regulation making it an offence wilfully to impede or obstruct an inspection, was not protected by the Fourth and Fourteenth Amendments of the Federal Constitution from prosecution for such offence.

COMPLAINT received and sworn to in the First District Court of Eastern Middlesex on June 22, 1965.

Following an appeal to the Superior Court after a finding of guilty, the case was transferred to the Third District Court of Eastern Middlesex under St. 1964, c. 628, upon a claim for trial by a jury of six. The defendant having subsequently waived trial by jury, the case was heard by *Crowley,* J., who found the defendant guilty and reported the case.

*Louis M. Nordlinger* for the defendant.

*Loyd M. Starrett,* Legal Assistant to the District Attorney (*Ruth I. Abrams,* Assistant District Attorney, with him), for the Commonwealth.

*Lewis H. Weinstein & Judith L. Olans* for Boston, Brookline, Cambridge, Malden & Worcester Redevelopment Authorities, amici curiae, joined in the Commonwealth's brief.

*Max Rosenblatt,* Assistant City Solicitor, for the City of Malden, amicus curiae, submitted a brief.

CUTTER, J. The code enforcement inspector of the Malden board of health filed a complaint in the District Court alleging that, on June 7, 1965, Hadley "did wilfully impede or obstruct an inspection . . . by the" code enforcement inspector upon certain premises in Malden. In the District Court, Hadley was found guilty of violating the Sanitary Code of the Department of Public Health,[1] art. 1, reg. 3.1.[2] He appealed. Upon this appeal Hadley filed a waiver of trial by jury, and was tried upon a statement of agreed facts. The trial judge found him guilty, imposed a fine of $50 and reported the case to this court upon the following issue: "[w]hether the protections embodied in the fourth and fourteenth amendments to the Constitution of the United States shelter the owner-occupier of a single family . . . [house] from prosecution for refusing to admit municipal inspectors who demand entry and are without probable cause and without a warrant authorizing entry." We must consider important practical aspects of the power of ad-

[1] The Sanitary Code, art. 1, reg. 3, was adopted by the department on September 13, 1960. See G. L. c. 111, § 5, as amended by St. 1957, c. 678, § 1, St. 1959, c. 522, and St. 1960, c. 172. Section 5 read in part: (see 2d par. as amended in 1959) "Said department shall adopt . . . public health regulations to be known as the . . . sanitary code, which may provide penalties for violations . . . not exceeding five hundred dollars for any one offence . . . . The code shall deal with matters affecting the health and well-being of the public . . . in subjects over which the department takes . . . responsibility. . . . Local boards of health shall enforce said code in the same manner in which local health . . . regulations are enforced . . . . The superior court shall have jurisdiction in equity to enforce . . . [the] code." The 1960 amendment added a provision that the "code may provide for the demolition, removal, repair or cleaning by local boards of health of any structure which so fails to comply with the standards of fitness for human habitation or other regulations in said code as to endanger or materially impair the health or well-being of the public."

[2] Regulation 3.1 provides, "In order . . . to carry out their . . . responsibilities under this code and . . . to protect the health and well-being of the people . . . the board of health and the Department of Public Health or the authorized . . . representative of either are authorized to enter, examine, or survey *at any reasonable time* such places as they consider necessary, and otherwise to conduct such examination or survey as is expressly provided in any other article. Any person who *wilfully, impedes or obstructs* an inspection or examination by the board of health or the Commissioner of Public Health or the authorized . . . representative of either in the discharge of his official duties shall be fined not less than ten nor more than fifty dollars" (emphasis supplied). By reg. 4.1, "each board of health may enforce this code by fine . . . or otherwise at law or in equity in the same manner that local . . . regulations are enforced."

ministrative officials to inspect dwelling houses in a reasonable manner either (a) to prevent, and warn against, conduct or conditions which may threaten the public health or safety, or (b) to obtain information about such conduct and conditions as a basis for later administrative action[3] (and possibly, to some extent, legislative action).

The agreed facts may be summarized: "Pursuant to a [city] program of code enforcement . . . the objective of which was to reveal conditions in private dwellings that may endanger the health and well being of occupants due to unsanitary circumstances or fire hazards, a staff of inspectors had, prior to . . . [this] case, and by prearrangement with the occupants been entering and inspecting dwellings in the city. Prior to the announced plan to inspect the home of the defendant many homes in the city had been inspected. During . . . August 1964 the first announcement . . . of the city's intention to inspect was delivered . . . in [the] defendant's neighborhood . . . including . . . [his] single family dwelling. Other letters and cards were mailed to the defendant asking for an appointment. . . . [T]he defendant did not reply, but his wife would call the chairman of the code enforcement commission." A staff inspector "visited the site and asked about a time for inspection. [The d]efendant's wife asked what the inspectors would be looking for and if there was a complaint, or warrant to enter. The staff inspector assured her there was no specific complaint or warrant and that the city was inspecting all homes in the district as part of a program to insure compliance with sanitary and safety laws. . . . [She] stated she did not want to have the house inspected without a showing of probable cause or a complaint of specific violation. [The d]efendant and his wife stated they would permit an inspection by the code enforcement staff after repairs to the house . . . then underway . . . [were] completed. Later the defendant stated he would not agree to

---

[3] The amici curiae suggest that the issue is important in connection with programs of urban redevelopment, housing, slum clearance, rehabilitation of decadent areas, and other similar social projects.

Commonwealth *v.* Hadley.

an inspection unless there were a showing of a specific complaint or unless a valid warrant to enter had issued." Since then, "additional demands have been made to gain entry by appointment and have been refused . . . . The [city] program of inspecting all homes by area . . . remains in operation . . . ."

1. Examination of the enactments authorizing the Sanitary Code, of the legislative history, and of the code itself indicates that the code's primary purpose from the beginning has been (a) to apply proper health and safety standards reasonably for the protection of the public in the prevention of violations, rather than (b) to punish past violations as criminal offences. See 1957 House Doc. No. 2833; 1965 House Doc. No. 4040 (esp. at pp. 54–55, see fn. 6, *infra*), a report in part the basis of St. 1965, c. 898, §§ 1, 3 (see 1965 House Bills Nos. 4441, 4449), which transferred the legislative authority for promulgating the code, formerly in G. L. c. 111, § 5, to c. 111, §§ 127A–127J. This type of prevention appears to be the general objective of similar codes throughout the country. See Carlton, Landfield, and Loken, Enforcement of Municipal Housing Codes, 78 Harv. L. Rev. 801, esp. at pp. 806–809.[4] We interpret reg. 3.1 (fn. 2) as having this type of preventive objective. Only incidentally does it seem designed to provide a basis for criminal prosecutions of past violators.

2. Regulation 3.1 (fn. 2) in terms requires that any inspection pursuant to its provisions shall be at a "reasonable time." The Malden code enforcement inspector correctly interpreted this provision as requiring that he respect the convenience and privacy of the occupants of premises so far as practicable and consistent with the public interest in the circumstances. The area inspection now in progress does not appear to have been of an emergency character, and we do not now consider the greatly different

---

[4] See also annotation, 65 Col. L. Rev. 288. Area inspection programs to prevent future or continuing violations, rather than punishing past violations, are in some degree analogous to statutory programs of compulsory vaccination, designed to prevent the outbreak of smallpox. See G. L. c. 111, § 181; *Jacobson* v. *Massachusetts*, 197 U. S. 11, 24–39.

issues which might be created by emergency conditions.[5] We treat this case as one in which the code contemplated that such an area inspection would proceed in an orderly manner (but, of course, without undue delay) and with due consideration for the interests and privacy of occupants.

The enforcement inspector seems to have acted throughout with commendable respect for the defendant's privacy and convenience. Efforts to make an appointment for an inspection were continued patiently until the defendant unequivocally refused to coöperate at all in the absence of a warrant or a specific complaint. Even then, it was only after additional demands for entry with the defendant's consent that the inspector initiated a criminal complaint. The inspector has not attempted to enter without consent or by force, and we have, of course, no occasion to consider the use (in any unlikely prosecution of a past violation) of evidence obtained by means of the inspection. Cf. *People* v. *Laverne,* 14 N. Y. 2d 304. Cf. also annotation, 65 Col. L. Rev. 288, 293.

3. The statute and the code (see fns. 1, 2) would have permitted the inspector to seek, by bill in equity in the Superior Court, an order requiring the defendant to permit an inspection at a reasonable time. In such a proceeding the defendant would have been able to present, in his effort to defeat the issuance of an order, any available evidence (a) that the proposed inspection had no reasonable relation to the enforcement of the Sanitary Code, or was to be made for purposes not within the scope of the code, (b) that it was undertaken without proper authority, or (c) that it was in some significant respect discriminatory, arbitrary, or capricious, or designed to harass the defendant. Such

---

[5] The code (see reg. 5.1) deals with the special considerations which may affect emergencies. It reads in part: ''Whenever an emergency exists which . . . requires that ordinary procedures be dispensed with, the board of health . . . acting in accordance with . . . [G. L. c. 111, § 30] may, without notice or hearing, issue an order reciting the . . . emergency and requiring . . . such action . . . as the board . . . deems necessary to meet the emergency. . . . [A]ny person to whom such order is directed shall comply therewith within the time specified . . ..'' Cf. powers of police in an emergency. *United States* v. *Barone,* 330 F. 2d 543, 544–545 (2d Cir.), cert. den. 377 U. S. 1004.

an equity proceeding, of course, would have been likely to involve some delay and more than nominal expense. The inspector thus reasonably may have thought that the criminal sanction under reg. 3.1 provided a simpler and less cumbersome method for encouraging the coöperation of the defendant through the imposition of a fine. See *Commonwealth* v. *Sostilio, ante,* 419, 422.

The present record contains no suggestion (a) that the area inspection was unauthorized, unreasonable,[6] or for any improper purpose, or designed to be a basis for any criminal prosecution (at least until after the defendant had reasonable opportunity to eliminate any violations which might be discovered and had failed to do so); or (b) that any discriminatory, arbitrary, or capricious action affecting the defendant or his property was proposed; or (c) that there was harassment. The defendant simply refuses to permit "[i]nspection without a warrant, as an adjunct to a regulatory scheme for the general welfare of the community and not as a means of enforcing the criminal law." See *Frank* v. *Maryland,* 359 U. S. 360, 367. See also *Eaton* v. *Price,* 168 Ohio St. 123, affirmed by an equally divided court, 364 U. S. 263.

4. The agreed facts present directly no question concerning what defences the defendant could have raised and what evidence he could have presented at the trial of a criminal complaint under reg. 3.1. The answers to these questions, however, bear indirectly upon whether the criminal sanction in reg. 3.1 is a constitutionally valid method of encouraging consent to an administrative public health inspection. We think that reg. 3.1 does not make it an offence for an occupant to refuse to permit an unauthorized, unreasonable, or discriminatory inspection. Accordingly, we interpret the regulation as permitting a defendant, prosecuted under it, to prove any one or more of the defences

---

[6] In the article in 78 Harv. L. Rev. 801, 807, already cited, the advantages of area inspections in preventing violations and area deterioration are described in detail. This portion of this article was cited with apparent approval in 1965 House Doc. No. 4040, pp. 54–55.

which he could assert in equity in opposition to the granting of an order to permit an inspection.    The general nature of these defences has already been stated.

The practical considerations supporting health inspections, discussed in the majority opinion in the *Frank* case, 359 U. S. 360, 371–372, and the result of that case, amply justify a prosecution for refusing to consent to an administrative inspection without a warrant of the type permitted by reg. 3.1 as we interpret it.    To prevent, for the benefit of the whole community, health hazards and unsafe conditions likely to cause sickness, fires, and other casualties, such inspections are necessary in a modern urban civilization.    We think that the Legislature, in authorizing the Sanitary Code, and the Department of Public Health, in promulgating reg. 3.1, have acted within constitutional limits.    The result of the affirmation in the *Eaton* case, 364 U. S. 263, supports this view.[7]

5.    The provisions of G. L. c. 111 authorizing promulgation of the Sanitary Code (formerly § 5, and now §§ 127A, 127B) and regs. 3.1 and 4.1 (fn. 2) themselves make no explicit provision for a search warrant in circumstances such as those before us.    These statutes and the regulations, however, permit the code enforcement inspector to use the procedures mentioned in G. L. c. 111, § 131 (governing the examination of premises for nuisances),[8] at least in those

---

[7] Two cases, now pending before the Supreme Court of the United States, present questions generally similar to those considered in the *Frank* case.    See *Camara* v. *Municipal Court,* 237 Cal. App. 2d 128 (U. S. Supr. Ct. Oct. term 1966, No. 92); *Seattle* v. *See,* 67 Wash. 2d 465 (U. S. Supr. Ct. Oct. term 1966, No. 180).    Cases which in general are consistent with the *Frank* case include *Givner* v. *State,* 210 Md. 484, *St. Louis* v. *Evans* (Mo.), 337 S. W. 2d 948, 954–959, *Richards* v. *Columbia,* 227 S. C. 538, 556.    See *Dederick* v. *Smith,* 88 N. H. 63, 71–73.    See also *United States* v. *Rickenbacker,* 309 F. 2d 462, 463 (2d Cir.) cert. den. 371 U. S. 962 (census inquiry); *State* v. *Rees,* 258 Iowa, 813.    [The Supreme Court of the United States on June 5, 1967, decided *Camara* v. *Municipal Court,* 387 U. S. 523, and *See* v. *Seattle,* 387 U. S. 541. On June 12, 1967, the Supreme Court remanded the instant case for further consideration in the light of the *Camara* case.    See 388 U. S. 464.    REPORTER.]

[8] Section 131 reads, ''If the board considers it necessary for preservation of life or health to enter any land, building or premises . . . to examine into and destroy, remove or prevent a nuisance, source of filth or cause of sickness, and the board . . . is refused such entry, any member of the board . . . may make complaint to a justice of any court of record or to a magistrate authorized to

situations where there is reasonable ground to believe that a nuisance exists. See also c. 111, § 165 (inspection for pollution of water supplies).

Section 131 seems to have been drawn primarily to deal with investigations based on complaints of nuisances and situations where there is some evidence of an actual nuisance on particular premises. Nevertheless, the words "examine into and destroy . . . or prevent a nuisance," are very broad and may permit obtaining a warrant to enforce a purely preventive area inspection despite the circumstance that no nuisance is known to exist, or to be threatened, within the area. We assume, without deciding, that § 131 does authorize such a warrant, although it does not specify, as would have been desirable, (a) what criteria are to govern magistrates in issuing warrants for such inspections, or (b) whether a warrant may issue upon proof only that a reasonable, nondiscriminatory, public health area inspection has been authorized and is being undertaken and that entry has been refused.[9]   Even if § 131 is thus construed, however, we think that neither (a) the statutes as supplemented by regs. 3.1 and 4.1, nor (b) general constitutional principles, in the light of the *Frank* case, 359 U. S. 360, 367, required the code enforcement inspector to have resort to § 131 to obtain a warrant. He was free to make use either of a bill in equity or the criminal sanction of reg. 3.1.

---

issue warrants, who may thereupon issue a warrant, directed to . . . [a] member or agent of the board . . . commanding him to take sufficient aid and at any reasonable time repair to the place where such nuisance . . . may be, and to destroy, remove or prevent the same, under the direction of the board.'' Cf. the provisions concerning inspections for the purpose of preventing fires. G. L. c. 148, § 4 (as amended through St. 1964, c. 123), § 5 (as amended through St. 1962, c. 456). The situation presented by the agreed facts does not appear to be one in which a search warrant could have been issued, on usual principles of "probable cause," under the statutes governing warrants in criminal cases. See G. L. c. 276, §§ 1–3A, inclusive, as amended. See also the cases collected in *Commonwealth* v. *Monosson, ante,* 327, 328–330.

[9] This type of proof might constitute a specialized type of modified "probable cause" adapted to general public health and fire inspections where the object of the inspection is merely precautionary and preventive. See Mr. Justice Brennan's discussion in *Eaton* v. *Price,* 364 U. S. 263, 271. See also the dissent in the *Frank* case, 359 U. S. 360, 374, 383; Waters, Rights of Entry in Administrative Officers, 27 U. of Chicago L. Rev. 79.

6. The defendant does not argue that, by denying admission, he did not "wilfully impede or obstruct" the inspector. Cf. *District of Columbia* v. *Little,* 339 U. S. 1, 4, 6–7, where the Supreme Court of the United States construed a somewhat comparable District regulation (penalizing, see p. 5, "interfering with or preventing" any inspection authorized by the regulations) as not making it an offence merely to decline to permit health officers to inspect.

Despite language of the *Little* case (holding that the word "interfere" in the regulation could not (p. 7) "fairly be interpreted to encompass [the] respondent's failure to unlock her door and her remonstrances on constitutional grounds"), we construe the somewhat different language of reg. 3.1 as designed to punish a definitive refusal to permit a reasonable and authorized inspection. We regard reg. 3.1 as comparable in purport to a statute (applicable to the District of Columbia and making it an offence to "hinder, prevent, or refuse to permit any lawful inspection"), distinguished in the *Little* case, 339 U. S. 1, 6 (see fn. 7), from the regulation directly there discussed.

7. We hold that, in the circumstances shown by the statement of agreed facts, the defendant's refusal to permit inspection was properly found to be in violation of reg. 3.1. The issue presented by the report is answered in the negative.

*So ordered.*