## SEE *v.* CITY OF SEATTLE.

No. 180. Argued February 15, 1967.—Decided June 5, 1967.

*Norman Dorsen* argued the cause for appellant. With him on the briefs were *Melvin L. Wulf* and *Marvin M. Karpatkin.*

*A. L. Newbould* argued the cause for appellee. With him on the brief was *Charles S. Rhyne.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Appellant seeks reversal of his conviction for refusing to permit a representative of the City of Seattle Fire Department to enter and inspect appellant's locked commercial warehouse without a warrant and without probable cause to believe that a violation of any municipal ordinance existed therein. The inspection was conducted as part of a routine, periodic city-wide canvass to obtain compliance with Seattle's Fire Code. City of Seattle Ordinance No. 87870, c. 8.01. After he refused the inspector access, appellant was arrested and charged with violating § 8.01.050 of the Code:

> "INSPECTION OF BUILDING AND PREMISES. It shall be the duty of the Fire Chief to inspect and he may enter all buildings and premises, except the interiors of dwellings, as often as may be necessary for the purpose of ascertaining and causing to be corrected any conditions liable to cause fire, or any violations of the provisions of this Title, and of any other ordinance concerning fire hazards."

542

Appellant was convicted and given a suspended fine of $100 [1] despite his claim that § 8.01.050, if interpreted to authorize this warrantless inspection of his warehouse, would violate his rights under the Fourth and Fourteenth Amendments. We noted probable jurisdiction and set this case for argument with *Camara* v. *Municipal Court, ante,* p. 523. 385 U. S. 808. We find the principles enunciated in the *Camara* opinion applicable here and therefore we reverse.

In *Camara,* we held that the Fourth Amendment bars prosecution of a person who has refused to permit a warrantless code-enforcement inspection of his personal residence. The only question which this case presents is whether *Camara* applies to similar inspections of commercial structures which are not used as private residences. The Supreme Court of Washington, in affirming appellant's conviction, suggested that this Court "has applied different standards of reasonableness to searches of dwellings than to places of business," citing *Davis* v. *United States,* 328 U. S. 582. The Washington court held, and appellee here argues, that § 8.01.050, which excludes "the interiors of dwellings," [2] establishes a

---

[1] Conviction and sentence were pursuant to § 8.01.140 of the Fire Code:

"PENALTY. Anyone violating or failing to comply with any provision of this Title or lawful order of the Fire Chief pursuant hereto shall upon conviction thereof be punishable by a fine not to exceed Three Hundred Dollars ($300.00), or imprisonment in the City Jail for a period not to exceed ninety (90) days, or by both such fine and imprisonment, and each day of violation shall constitute a separate offense."

[2] "Dwelling" is defined in the Code as "a building occupied exclusively for residential purposes and having not more than two (2) dwelling units." Such dwellings are subject to the substantive provisions of the Code, but the Fire Chief's right to enter such premises is limited to times "when he has reasonable cause to believe a violation of the provisions of this Title exists therein." § 8.01.040. This provision also lacks a warrant procedure.

reasonable scheme for the warrantless inspection of commercial premises pursuant to the Seattle Fire Code.

In *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344; *Amos* v. *United States,* 255 U. S. 313; and *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, this Court refused to uphold otherwise unreasonable criminal investigative searches merely because commercial rather than residential premises were the object of the police intrusions. Likewise, we see no justification for so relaxing Fourth Amendment safeguards where the official inspection is intended to aid enforcement of laws prescribing minimum physical standards for commercial premises. As we explained in *Camara,* a search of private houses is presumptively unreasonable if conducted without a warrant. The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant.

As governmental regulation of business enterprise has mushroomed in recent years, the need for effective investigative techniques to achieve the aims of such regulation has been the subject of substantial comment and legislation.[3] Official entry upon commercial property

---

[3] See Antitrust Civil Process Act of 1962, 76 Stat. 548, 15 U. S. C. §§ 1311–1314; H. R. Rep. No. 708, 83d Cong., 1st Sess. (1953) (reporting the "factory inspection" amendments to the Federal Food, Drug, and Cosmetic Act, 67 Stat. 476, 21 U. S. C. § 374); Davis, The Administrative Power of Investigation, 56 Yale L. J. 1111; Handler, The Constitutionality of Investigations by the Federal Trade Commission, I & II, 28 Col. L. Rev. 708, 905; Schwartz, Crucial Areas in Administrative Law, 34 Geo. Wash. L. Rev. 401, 425–430; Note, Constitutional Aspects of Federal Tax Investigations, 57 Col. L. Rev. 676.

is a technique commonly adopted by administrative agencies at all levels of government to enforce a variety of regulatory laws; thus, entry may permit inspection of the structure in which a business is housed, as in this case, or inspection of business products, or a perusal of financial books and records. This Court has not had occasion to consider the Fourth Amendment's relation to this broad range of investigations.[4] However, we have dealt with the Fourth Amendment issues raised by another common investigative technique, the administrative subpoena of corporate books and records. We find strong support in these subpoena cases for our conclusion that warrants are a necessary and a tolerable limitation on the right to enter upon and inspect commercial premises.

It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.[5] The agency has the right to conduct all reasonable inspections of such documents which are contemplated by statute, but it must delimit the confines of a search by designating the needed documents in a formal subpoena. In addition, while the demand to inspect may be issued by the agency, in the form of an administrative subpoena, it may not be made and en-

---

[4] In *United States v. Cardiff*, 344 U. S. 174, this Court held that the Federal Food, Drug, and Cosmetic Act did not compel that consent be given to warrantless inspections of establishments covered by the Act. (As a result, the statute was subsequently amended, see n. 3, *supra*.) See also *Federal Trade Comm'n v. American Tobacco Co.*, 264 U. S. 298.

[5] See *United States v. Morton Salt Co.*, 338 U. S. 632; *Oklahoma Press Pub. Co. v. Walling*, 327 U. S. 186; *United States v. Bausch & Lomb Optical Co.*, 321 U. S. 707; *Hale v. Henkel*, 201 U. S. 43. See generally 1 Davis, Administrative Law §§ 3.05–3.06 (1958).

forced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply.

It is these rather minimal limitations on administrative action which we think are constitutionally required in the case of investigative entry upon commercial establishments. The agency's particular demand for access will of course be measured, in terms of probable cause to issue a warrant, against a flexible standard of reasonableness that takes into account the public need for effective enforcement of the particular regulation involved. But the decision to enter and inspect will not be the product of the unreviewed discretion of the enforcement officer in the field.[6] Given the analogous investigative functions performed by the administrative subpoena and the demand for entry, we find untenable the proposition that the subpoena, which has been termed a "constructive" search, *Oklahoma Press Pub. Co.* v. *Walling,* 327 U. S. 186, 202, is subject to Fourth Amendment limitations which do not apply to actual searches and inspections of commercial premises.

We therefore conclude that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure.[7] We do not in any way

---

[6] We do not decide whether warrants to inspect business premises may be issued only after access is refused; since surprise may often be a crucial aspect of routine inspections of business establishments, the reasonableness of warrants issued in advance of inspection will necessarily vary with the nature of the regulation involved and may differ from standards applicable to private homes.

[7] *Davis* v. *United States,* 328 U. S. 582, relied upon by the Supreme Court of Washington, held only that government officials could demand access to business premises and, upon obtaining consent to search, could seize gasoline ration coupons issued by the

imply that business premises may not reasonably be inspected in many more situations than private homes, nor do we question such accepted regulatory techniques as licensing programs which require inspections prior to operating a business or marketing a product. Any constitutional challenge to such programs can only be resolved, as many have been in the past, on a case-by-case basis under the general Fourth Amendment standard of reasonableness. We hold only that the basic component of a reasonable search under the Fourth Amendment—that it not be enforced without a suitable warrant procedure—is applicable in this context, as in others, to business as well as to residential premises. Therefore, appellant may not be prosecuted for exercising his constitutional right to insist that the fire inspector obtain a warrant authorizing entry upon appellant's locked warehouse.

*Reversed.*

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.*

Eight years ago my Brother Frankfurter wisely wrote in *Frank* v. *Maryland*, 359 U. S. 360 (1959):

> "Time and experience have forcefully taught that the power to inspect dwelling places, either as a matter of systematic area-by-area search or, as here, to treat a specific problem, is of indispensable importance to the maintenance of community health; a power that would be greatly hobbled by the blanket requirement of the safeguards necessary for a search of evidence of criminal acts. The need for pre-

Government and illegally possessed by the petitioner. *Davis* thus involved the reasonableness of a particular search of business premises but did not involve a search warrant issue.

*[This opinion applies also to No. 92, *Camara* v. *Municipal Court of the City and County of San Francisco, ante,* p. 523.]

ventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few." At 372.

Today the Court renders this municipal experience, which dates back to Colonial days, for naught by overruling *Frank* v. *Maryland* and by striking down hundreds of city ordinances throughout the country and jeopardizing thereby the health, welfare, and safety of literally millions of people.

But this is not all. It prostitutes the command of the Fourth Amendment that "no Warrants shall issue, but upon probable cause" and sets up in the health and safety codes area inspection a newfangled "warrant" system that is entirely foreign to Fourth Amendment standards. It is regrettable that the Court wipes out such a long and widely accepted practice and creates in its place such enormous confusion in all of our towns and metropolitan cities in one fell swoop. I dissent.

## I.

I shall not treat in any detail the constitutional issue involved. For me it was settled in *Frank* v. *Maryland, supra.* I would adhere to that decision and the reasoning therein of my late Brother Frankfurter. Time has not shown any need for change. Indeed the opposite is true, as I shall show later. As I read it, the Fourth Amendment guarantee of individual privacy is, by its language, specifically qualified. It prohibits only those searches that are "unreasonable." The majority seem to recognize this for they set up a new test for the long-recognized and enforced Fourth Amendment's "probable-cause" requirement for the issuance of warrants. They would permit the issuance of paper warrants, in area inspection programs, with probable cause based on area inspection standards as set out in municipal codes, and

with warrants issued by the rubber stamp of a willing magistrate.[1] In my view, this degrades the Fourth Amendment.

## II.

Moreover, history supports the *Frank* disposition. Over 150 years of city *in rem* inspections for health and safety purposes have continuously been enforced. In only one case during all that period have the courts denied municipalities this right. See *District of Columbia* v. *Little,* 85 U. S. App. D. C. 242, 178 F. 2d 13 (1949), aff'd on other grounds, 339 U. S. 1 (1950). In addition to the two cases in this Court (*Frank, supra,* and *Eaton* v. *Price,* 364 U. S. 263 (1960)), which have upheld the municipal action, not a single state high court has held against the validity of such ordinances. Indeed, since our *Frank* decision five of the States' highest courts have found that reasonable inspections are constitutionally permissible and in fact imperative, for the protection of health, safety, and welfare of the millions who inhabit our cities and towns.[2]

I submit that under the carefully circumscribed requirements of health and safety codes, as well as the facts and circumstances of these particular inspections,

---

[1] Under the probable-cause standard laid down by the Court, it appears to me that the issuance of warrants could more appropriately be the function of the agency involved than that of the magistrate. This would also relieve magistrates of an intolerable burden. It is therefore unfortunate that the Court fails to pass on the validity of the use of administrative warrants.

[2] *DePass* v. *City of Spartanburg,* 234 S. C. 198, 107 S. E. 2d 350 (1959); *City of St. Louis* v. *Evans,* 337 S. W. 2d 948 (Mo. 1960); *Camara* v. *Municipal Court,* 237 Cal. App. 2d 128, 46 Cal. Rptr. 585 (1965), pet. for hearing in Cal. Sup. Ct. den. (Civ. No. 22128) Nov. 19, 1965; *Commonwealth* v. *Hadley,* 351 Mass. 439, 222 N. E. 2d 681, appeal docketed, Jan. 5, 1967, No. 1179, Misc., O. T. 1966; *City of Seattle* v. *See,* 67 Wash. 2d 475, 408 P. 2d 262 (1965).

there is nothing unreasonable about the ones undertaken here. These inspections meet the Fourth Amendment's test of reasonableness and are entirely consistent with the Amendment's commands and our cases.

There is nothing here that suggests that the inspection was unauthorized, unreasonable, for any improper purpose, or designed as a basis for a criminal prosecution; nor is there any indication of any discriminatory, arbitrary, or capricious action affecting the appellant in either case. Indeed, Camara was admittedly violating the Code by living in quarters prohibited thereby; and See was operating a locked warehouse—a business establishment subject to inspection.

The majority say, however, that under the present system the occupant has no way of knowing the necessity for the inspection, the limits of the inspector's power, or whether the inspector is himself authorized to perform the search. Each of the ordinances here is supported by findings as to the necessity for inspections of this type and San Francisco specifically bans the conduct in which appellant Camara is admittedly engaged. Furthermore, all of these doubts raised by the Court could be resolved very quickly. Indeed, the inspectors all have identification cards which they show the occupant and the latter could easily resolve the remaining questions by a call to the inspector's superior or, upon demand, receive a written answer thereto. The record here shows these challenges could have been easily interposed. The inspectors called on several occasions, but still no such questions were raised.[3] These cases, from the outset, were based on the Fourth Amendment, not on any of the circumstances surrounding the attempted inspection. To say, there-

---

[3] Indeed, appellant Camara was summoned to the office of the district attorney—but failed to appear—where he certainly could have raised these questions.

fore, that the inspection is left to the discretion of the officer in the field is to reach a conclusion not authorized by this record or the ordinances involved here. The Court says the question is not whether the "inspections may be made, but whether they may be made without a warrant." With due respect, inspections of this type have been made for over a century and a half without warrants and it is a little late to impose a death sentence on such procedures now. In most instances the officer could not secure a warrant—such as in See's case—thereby insulating large and important segments of our cities from inspection for health and safety conditions. It is this situation—which is even recognized by the Court—that should give us pause.

III.

The great need for health and safety inspection is emphasized by the experience of San Francisco, a metropolitan area known for its cleanliness and safety ever since it suffered earthquake and fire back in 1906. For the fiscal year ending June 30, 1965, over 16,000 dwelling structures were inspected, of which over 5,600 required some type of compliance action in order to meet code requirements. And in 1965–1966 over 62,000 apartments, hotels, and dwellings were inspected with similar results. During the same period the Public Works Department conducted over 52,000 building inspections, over 43,000 electrical ones and over 33,000 plumbing inspections. During the entire year 1965–1966 inspectors were refused entry on less than 10 occasions where the ordinance required the householder to so permit.

In Seattle, the site of No. 180, *See* v. *City of Seattle*, fire inspections of commercial and industrial buildings totaled over 85,000 in 1965. In Jacksonville, Florida, over 21,000 fire inspections were carried on in the same year, while in excess of 135,000 health inspections were

conducted. In Portland, Oregon, out of 27,000 health and safety inspections over 4,500 violations of regulations were uncovered and the fire marshal in Portland found over 17,000 violations of the fire code in 1965 alone. In Boston over 56,000 code violations were uncovered in 1966 while in Baltimore a somewhat similar situation was reported.

In the larger metropolitan areas such as Los Angeles, over 300,000 inspections (health and fire) revealed over 28,000 hazardous violations. In Chicago during the period November 1965 to December 1966, over 18,000 buildings were found to be rodent infested out of some 46,000 inspections. And in Cleveland the division of housing found over 42,000 violations of its code in 1965; its health inspectors found over 33,000 violations in commercial establishments alone and over 27,000 dwelling code infractions were reported in the same period. And in New York City the problem is even more acute. A grand jury in Brooklyn conducted a housing survey of 15 square blocks in three different areas and found over 12,000 hazardous violations of code restrictions in those areas alone. Prior to this test there were only 567 violations reported in the three areas. The pressing need for inspection is shown by the fact that some 12,000 additional violations were actually present at that very time.

An even more disastrous effect will be suffered in plumbing violations. These are not only more frequent but also the more dangerous to the community. Defective plumbing causes back siphonage of sewage and other household wastes. Chicago's disastrous amoebic dysentery epidemic is an example. Over 100 deaths resulted. Fire code violations also often cause many conflagrations. Indeed, if the fire inspection attempted in *District of Columbia* v. *Little,* 339 U. S. 1 (1950),

had been permitted a two-year-old child's death resulting from a fire that gutted the home involved there on August 6, 1949, might well have been prevented.

Inspections also play a vital role in urban redevelopment and slum clearance. Statistics indicate that slums constitute 20% of the residential area of the average American city, still they produce 35% of the fires, 45% of the major crimes, and 50% of the disease. Today's decision will play havoc with the many programs now designed to aid in the improvement of these areas. We should remember the admonition of MR. JUSTICE DOUGLAS in *Berman* v. *Parker*, 348 U. S. 26, 32 (1954):

> "Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden."

## IV.

The majority propose two answers to this admittedly pressing problem of need for constant inspection of premises for fire, health, and safety infractions of municipal codes. First, they say that there will be few refusals of entry to inspect. Unlike the attitude of householders as to codes requiring entry for inspection, we have few empirical statistics on attitudes where consent must be obtained. It is true that in the required entry-to-inspect situations most occupants welcome the periodic visits of municipal inspectors. In my view this will not be true when consent is necessary. The City of Portland, Oregon, has a voluntary home inspection program. The 1966 record shows that out of 16,171 calls where the occupant was at home, entry was refused in 2,540 cases—approximately one out of six. This is a large percentage and would place an intolerable burden on the inspection serv-

ice when required to secure warrants. What is more important is that out of the houses inspected 4,515 hazardous conditions were found! Hence, on the same percentage, there would be approximately 840 hazardous situations in the 2,540 in which inspection was refused in Portland.

Human nature being what it is, we must face up to the fact that thousands of inspections are going to be denied. The economics of the situation alone will force this result. Homeowners generally try to minimize maintenance costs and some landlords make needed repairs only when required to do so. Immediate prospects for costly repairs to correct possible defects are going to keep many a door closed to the inspector. It was said by way of dissent in *Frank* v. *Maryland, supra,* at 384, that "[o]ne rebel a year" is not too great a price to pay for the right to privacy. But when voluntary inspection is relied upon this "one rebel" is going to become a general rebellion. That there will be a significant increase in refusals is certain and, as time goes on, that trend may well become a frightening reality. It is submitted that voluntary compliance cannot be depended upon.

The Court then addresses itself to the propriety of warrantless area inspections.[4] The basis of "probable cause" for area inspection warrants, the Court says, begins with the Fourth Amendment's reasonableness requirement; in determining whether an inspection is reasonable "the need for the inspection must be weighed in terms of these reasonable goals of code enforcement." It adds that there are "a number of persuasive factors"

---

[4] It is interesting to note that in each of the cases here the authorities were making periodic area inspections when the refusals to allow entry occurred. Under the holding of the Court today, "probable cause" would therefore be present in each case and a "paper warrant" would issue as a matter of course. This but emphasizes the absurdity of the holding.

supporting "the reasonableness of area code-enforcement inspections." It is interesting to note that the factors the Court relies upon are the identical ones my Brother Frankfurter gave for excusing warrants in *Frank* v. *Maryland, supra*. They are: long acceptance historically; the great public interest in health and safety; and the impersonal nature of the inspections—not for evidence of crime—but for the public welfare. Upon this reasoning, the Court concludes that probable cause exists "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." These standards will vary, it says, according to the code program and the condition of the area with reference thereto rather than the condition of a particular dwelling. The majority seem to hold that warrants may be obtained after a refusal of initial entry; I can find no such constitutional distinction or command. These boxcar warrants will be identical as to every dwelling in the area, save the street number itself. I daresay they will be printed up in pads of a thousand or more—with space for the street number to be inserted—and issued by magistrates in broadcast fashion as a matter of course.

I ask: Why go through such an exercise, such a pretense? As the same essentials are being followed under the present procedures, I ask: Why the ceremony, the delay, the expense, the abuse of the search warrant? In my view this will not only destroy its integrity but will degrade the magistrate issuing them and soon bring disrepute not only upon the practice but upon the judicial process. It will be very costly to the city in paperwork incident to the issuance of the paper warrants, in loss of time of inspectors and waste of the time of magistrates and will result in more annoyance to the public. It will also be more burdensome to the occupant of the premises to be inspected. Under a search warrant the inspector

can enter any time he chooses. Under the existing procedures he can enter only at reasonable times and invariably the convenience of the occupant is considered. I submit that the identical grounds for action elaborated today give more support—both legal and practical—to the present practice as approved in *Frank* v. *Maryland, supra,* than they do to this legalistic facade that the Court creates. In the Court's anxiety to limit its own holding as to mass searches it hopes to divert attention from the fact that it destroys the health and safety codes as they apply to individual inspections of specific problems as contrasted to area ones. While the latter are important, the individual inspection is often more so; that was true in *District of Columbia* v. *Little* and it may well be in both *Camara* and *See.* Frankly, I cannot understand how the Court can authorize warrants in wholesale fashion in the case of an area inspection, but hold the hand of the inspector when a specific dwelling is hazardous to the health and safety of its neighbors.