## No. 46,685
STATE OF KANSAS, *Appellant*, v. DONALD E. DAILEY, *Appellee*.
(498 P. 2d 614)

Opinion filed June 10, 1972.

*Vern Miller*, Attorney general, and *Edward G. Collister, Jr.*, Assistant Attorney General, both argued the cause and were on the brief for the appellant.

*Hugh D. Mauch*, of Great Bend, and *Robert P. Keenan*, of Keenan and Keenan, of Great Bend, both argued the cause and were on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: This is an interlocutory appeal by the state pursuant to K. S. A. 1971 Supp. 22-3603 from an order of the trial court suppressing certain evidence after an evidentiary hearing under the provisions of K. S. A. 1971 Supp. 22-3216 (2). The central issue involves the warrantless search of a private club and the seizure of gambling equipment, which is claimed by the state to have been reasonable and authorized by the provisions of K. S. A. 1971 Supp. Chapter 41, Article 26 "Licensing and Regulation of Clubs"—hereafter referred to as the Private Club Act. Defendant, on the other hand, contends the act authorizes only an entry and search for liquor violations; and thus an entry and search for gambling equipment and the subsequent seizure thereof is unlawful.

The information filed in the district court by the attorney general on November 23, 1971, charged the defendant with two counts of gambling offenses. Count one alleged an offense of setting up gambling devices consisting of five slot machines in violation of K. S. A. 1971 Supp. 21-4304 (e), a class E felony under the provisions of the statute. Count two charged defendant with possession of the five slot machines in violation of K. S. A. 1971 Supp. 21-4307, a class B misdemeanor.

The charges stem from a warrantless entry and search of the American Legion Club in Great Bend on the night of October 2, 1971. The defendant was manager of the club and on duty at the time. At his direction the door to the club was opened by a mem-

ber, Willis Weigel, for the initial entrance of a party of four officers led by special agent Earl Maudlin of the Kansas Bureau of Investigation. It is undisputed that all of the officers involved fall within the category of "peace officers" as the term is used in section 41-2613 of the Private Club Act.

In its memorandum decision the trial court described the entrance in this fashion:

"Their ringing at the locked door of entry was answered by a man authorized to see who was there. When he opened the door, the team leader did not ask permission to enter, but gave his name, said he was 'with the K. B. I. and this is a raid.' Without waiting for response, he and his team members rushed into the club. The doorman said he was pushed aside, but this is disputed. The leader said they walked 'faster than we would walk down the street.' Witnesses to the 'walk' had varying descriptions from 'rushed on,' to 'real fast,' to 'wouldn't say running but letting no grass grow under their feet,' and to 'like a trot.'

"The doorman advised this defendant that 'It's a raid, it's the K. B. I.' The defendant then cooperated with the leader. He testified that he felt compelled to do so. . . ."

After entering the club premises the officers proceeded rapidly through the front room, described as a cocktail lounge, and entered a second room, described as a game room. Defendant was asked to unlock several locked closet doors in the game room. Defendant had to go back to the cash register to secure keys. Defendants unlocked what he described as "a roll-up curtain steel door" which revealed the subject slot machines which were then seized by the officers.

The provisions of the act critical to this appeal are found in K. S. A. 1971 Supp 41-2613 which reads:

"The right of immediate entry and *inspection* at any time of any premises licensed as a club under this act, or of any premises subject to the control of any club licensed under this act by any duly authorized officer or agent of the director, *or by any peace officer,* shall be a condition on which every club license shall be issued, and the application for, and acceptance of, any club license hereunder *shall conclusively be deemed to be the consent of the applicant and licensee to such immediate entry and inspection.* Such consent shall not be revocable during the term of the license. *Refusal* of such entry shall be grounds for revocation of the license." (Emphasis supplied.)

Following the filing of the information the defendant filed a motion to suppress all of the evidence seized. The gist of the grounds for suppression were alleged as follows:

"2. That this motion is filed to enforce the constitutional protection against illegal search and seizure as provided in the Kansas Constitution, Bill of

Rights, Section 15, and the U. S. Constitution, 14th Amendment which applies since *Mapp v. Ohio,* 367 U. S. 643, which denies the admission of illegally seized evidence.

"3. Defendant shows, in support of this motion, that all evidence upon which counts one and two are based was secured as a result of an unlawful search and seizure, all without benefit of a Search Warrant, all contrary to, and in total disregard for the statutory provisions set out in Article 25—Search and Seizure—K. S. A. (1970 Supp.) 22-2501 through 2513; also in violation of the constitutional guarantees set out in part (2) above."

Defendant further alleged that the avowed purpose of the entry was to "conduct a raid to find gambling equipment" which defendant claims is not contemplated by K. S. A. 1971 Supp. 41-2613, authorizing warrantless entry of a private club. Defendant alleged that if the statute does in fact authorize peace officers to conduct such a raid and to search and seize without the benefit of a search warrant, the statute is unconstitutional being in conflict with the Fourteenth Amendment to the Constitution of the United States and Section 15 of the Bill of Rights to the Constitution of the State of Kansas.

The trial court heard the testimony of several peace officers, who were involved, and that of defendant and several club members, who were present, concerning the circumstances surrounding the entry of the peace officers and the ensuing search of the club premises.

Following the hearing, the trial court filed a comprehensive memorandum decision in which all of the evidence was reviewed and basic findings of fact relative to the search were set out and enumerated. In substance the trial court found eight officers at one time or another took part in the search of the club; that none of the officers had been instructed that the raid was a liquor violation inspection, nor were any of them knowledgeable concerning liquor violations of the Private Club Act; that all eight officers considered that they were just to conduct a gambling raid; that they expected to find gambling equipment; that no search warrant was obtained even though judicial personnel were readily available for the issuance of a search warrant; and that one could have been obtained without working any substantial inconvenience to the officers. The trial court further found that the simultaneous entry by four of the law officers constituted a show of force; that the lack of resistance by the club doorman and defendant con-

stituted only peaceful submission to a law force and did not amount to permission to enter, and that "The entry was coercive."

The trial court concluded that the warrantless search was not authorized by the private club entry and inspection statute and that if the statute did authorize an entry and search, such as that shown by the evidence in this case, it would be unconstitutional as measured by both the Federal and Kansas Constitutions. The trial court cited and discussed many state and federal cases which it relied upon in arriving at the conclusions announced.

Prefatory to a discussion of the precise issues on appeal, it should be noted that while the Private Club Act has been examined by this court in several previous cases, the questions presented herein are of first impression. Nevertheless, we believe some prior expressions of this court relating to the act are pertinent in establishing a proper concept for consideration of the issues presented.

At the outset, it should be kept in mind that the statutes providing for the licensing and regulation of clubs, which we refer to as "The Private Club Act", when enacted in 1965, were incorporated into the "Kansas Liquor Control Act," enacted in 1949, which now appears as K. S. A. Chapter 41. The legislative history of the Private Club Act, in the context of the Kansas Liquor Control Act, is documented in the case of *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 408 P. 2d 877, wherein challenges of certain provisions of the act relating to classification of clubs were rejected by this court. We shall not repeat historical background related in the *Tri-State* opinion, but we believe what was said therein, concerning the purpose and thrust of the act and the authority of the legislature in connection therewith, to be extremely relevant to issues confronting us herein. With respect to these matters we had this to say in *Tri-State*:

"The express purpose of the Act is to define and regulate places where alcoholic liquor might be lawfully consumed in the state. The subject matter being one attendant with danger to the state, the legislature could authorize or prohibit its consumption under such conditions as it deemed essential to impose so as to limit its evil propensities to the utmost degree. (*State v. Nossaman*, 107 Kan. 715, 193 Pac. 347.) It is elementary law that the people may exercise all governmental powers not surrendered by them to the federal government and which they have not restrained themselves by the provisions of their own state Constitution. While Article 15, Section 10 of the Kansas Constitution is authorizing in nature, it restrains the legislature in its power to tolerate only, not in its power to suppress. It clearly does not abridge or limit the power of the legislature to determine the extent or places or conditions to

which, or upon which, alcoholic liquor may be consumed in the state. No right to determine the extent to which alcoholic liquor may be consumed was reserved to the plaintiffs, and they must abide by the regulations adopted by the legislature. What the legislature may entirely withhold, *it may grant upon such terms as it may see fit. Any conditions which in its wisdom it may deem necessary to impose, must be met and endured.* In other words, the legislature was empowered to prohibit the consumption of alcoholic liquor in licensed class A and class B clubs; it had the power to permit the consumption of alcoholic liquor in both types of clubs upon such conditions as it saw fit to impose, or to permit its consumption in one type club and entirely prohibit its consumption in the other. Whether as a matter of policy the legislature ought to have enacted the Act it did, this court has no right to say. That it had the power, under the law, to do so, this court cannot, under the law, do otherwise than declare." (p. 761.) (Emphasis supplied.)

Other expressions of this court reflecting the broad scope of legislative authority in regulating all facets of the use and consumption of intoxicating liquor may be found in *State v. Logan,* 198 Kan. 211, 424 P. 2d 565; *State, ex rel., v. Mermis,* 187 Kan. 611, 358 P. 2d 936; *Murphy v. Curtis,* 184 Kan. 291, 336 P. 2d 411; and *State v. Payne,* 183 Kan. 396, 327 P. 2d 1071, wherein we said:

"It has been repeatedly held that under the 21st Amendment a state may absolutely prohibit the manufacture, transportation, importation, sale or possession of alcoholic liquors irrespective of when or where produced or obtained, or the use to which they are to be put, and may adopt measures reasonably appropriate to effectuate those inhibitions and exercise full police authority in respect to them, unfettered by the due process clause, the equal protection clause or the commerce clause. (citing cases.)" (P. 403.)

We believe the contentions of the parties on appeal may be fairly summarized in this fashion: (1) Does the term "inspection" as used in 41-2613 encompass a "gambling raid", the sole purpose of which was to search for gambling equipment? (2) Is a consent or submission to the authority of peace officers, as shown by the evidence in this case, within the contemplation of the "consent" provisions of 41-2613 and, if so, then does the act offend against constitutional safeguards of Section 15 of the Kansas Bill of Rights and Article 4 of the Bill of Rights of the Constitution of the United States? Diligent counsel for both the state and defendant present persuasive arguments in support of their respective positions.

Much of the trial court's consideration, and a substantial portion of the briefs by both parties, is devoted to the proposition whether the entry and search herein amounted to an "inspection", as that term is used in the Private Club Act, or a general exploratory search for gambling equipment. Any question concerning this

matter has been entirely removed from this case by the attorney general's candid announcement at oral argument that "this was a preplanned gambling raid in response to complaints of gambling received by his office." Thus, assuming for the moment that the entry by the officers was at least permissive rather than forcible, the issue for our determination is narrowed to the questions whether the pertinent provisions of the Private Club Act authorize a search for gambling equipment and, if so, are such provisions unconstitutional.

The defendant takes the position that the term "inspection" contemplates only an inspection for liquor violations and does not encompass "gambling raid"—the admitted purpose of the intrusion by the officers in this case. The state, on the other hand, contends that "inspection" contemplates a search or investigation of the premises for any violation of the act and that by reason of related sections of the act, any gambling offense is a violation thereof.

In considering the issue joined by the parties in this regard, we are compelled by familiar rules of statutory construction to interpret the entry and inspection provisions of 41-2613 in the light of all other provisions of the act giving effect to every provision of the act if possible and to determine the intent of the legislature from consideration of the entire act. (*Wilcox v. Billings*, 200 Kan. 654, 438 P. 2d 108; *In re Estate of Diebolt*, 187 Kan. 2, 353 P. 2d 803; and *State v. Logan*, supra.)

Bearing on this point, in dealing with construction of various provisions of the Liquor Control Act, we held in *State v. Sumner*, 169 Kan. 516, 219 P. 2d 438:

"In order to ascertain the legislative intent courts are not permitted to consider only a certain isolated part or parts, of an act but are required to consider and construe together all parts thereof *in pari materia*.

"It is the duty of courts to reconcile various provisions of an act in order to make them consistent, harmonious and sensible if that can be done without doing violence to plain provisions therein contained.

"When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law." (Syl. ¶¶ 1, 2 and 3.)

See, also, *State v. Payne*, 183 Kan. 396, 327 P. 2d 1071.

In the grounds specified for the suspension or revocation of a club license in K. S. A. 1971 Supp. 41-2611, subsection (*e*) provides as follows:

"For violation on the club premises of any provision of the laws of this state, or of the United States, pertaining to the (*i*) sale of intoxicating liquors or beverages or alcoholic liquors (*ii*) or any crime involving a 'morals charge' as defined in section 10 (*b*) [41-2610 (*b*)] of this act;"

K. S. A. 1971 Supp. 41-2610 (*b*) specifically includes gambling among the other "morals charges" enumerated. The legislature further emphasized what it apparently deemed to be the reprehensible relationship between a licensed private club and gambling by specifying that—

". . . [T]he purchase and display in the licensed premises by the licensee club, its managing officers or any employee, of a federal wagering occupational stamp issued by the United States treasury department or the purchase and display in the licensed premises by the licensee club, its managing officers or any employee, of a federal coin operated gambling device stamp for the club premises issued by the United States treasury department. . . ." (41-2611 [*f*])

Apparently, the trial court was persuaded by the argument of defendant's counsel that "inspection" as used in the statute does not encompass an investigation and search such as was undertaken by the officers in the instant case. Diligent counsel cite a number of state and federal cases in support of defendant's position on this point and it must be conceded the cases cited construe the particular statutory enactments involved in harmony with the theory advanced by defendant. The statutes in the cases referred to, however, are generally limited in scope to inspections for violations of regulations directly relating to the administrative supervision of the business or enterprise involved. We are obliged to consider the provisions of our own Private Club Act and the broad spectrum of offenses which are designated as violations thereof. To give the term "inspection" as used in our act the narrow construction sought by defendant would work to make many of the enforcement provisions of the act meaningless and would fly in the face of what we believe to have been the scope of the act contemplated by the legislature. Reading our act as a whole, in particular the use of the term "any peace officer" and the specification of many criminal activities in addition to liquor violations, as being in violation of the act, leads unalterably to the conclusion that "inspection" was meant to encompass a complete investigation and search of the licensed premises for any of the activities specifically proscribed as being in violation of the act. The power to inspect is a necessary incident of the power to regu-

late, if inspection were to be deemed anything less than search, the regulatory provisions of the act would be emasculated.

When confronted with an argument that the right to search entails more authority than the right to inspect in *Oklahoma Alcoholic Beverage Con. Bd. v. McCulley* (Okla. 1962), 377 P. 2d 568, the Supreme Court of Oklahoma had this to say:

"It is attempted to draw a distinction between the right to inspect and the right to search. We are of the opinion that this is mere guibbling. If it were not so, why would the legislature have provided that it would be unnecessary to have a search warrant to inspect the premises. . . ." (p. 570.)

See, also, *Silber v. Bloodgood,* 177 Wis. 608, 188 N. W. 84; and *Nick Plainos v. The State,* 131 Texas Crim. Rep. 516, 100 S. W. 2d 367.

The legislature saw fit to specify gambling as violative of the Private Club Act and further provided that the acceptance of a license should be conclusively deemed to be consent to immediate entry and inspection by any peace officer for all evidence of violations of the act. Whether, as a matter of policy, the legislature should have imposed such harsh regulations upon a private club, which accepted a license to dispense intoxicating liquor, is not for this court to say. This court is not made the critic of the legislature by the constitution, but rather by command, our function is made that of guardian of the constitution, and every legislative act that comes before this court is surrounded with presumption of constitutionality. All doubts of invalidity must be resolved in favor of the law. It is not our province to weigh the desirability of social or economic policy underlying the statute or to question its wisdom; those are purely legislative matters. (*Tri-State Hotel Co. v. Londerholm,* supra; *Grigsby v. Mitchum,* 191 Kan. 293, 380 P. 2d 363; and *Gilbert v. Mathews,* 186 Kan. 672, 352 P. 2d 58.)

As previously indicated, this court has repeatedly found all facets of the regulation of intoxicating liquor to be within the scope of the state's police power and that the only limitations upon the exercise of that power are that regulations must have reference in fact to the welfare of society. In the instant case the declaration that gambling, as related to the operation of a private club, is inimical to the welfare of society is a proper exercise of the state's police power.

We are convinced by reading the provisions of 41-2613 in the context of the entire Private Club Act that an entry and search by

peace officers for gambling is contemplated and authorized; thus the characterization of the entry and search here as a "gambling raid" is of no legal consequence. A search for gambling violations, under the terms of the act, falls in no different classification than a search for liquor violations or any other proscribed activities.

It must be conceded that our Private Club Act, by including various criminal activities unrelated directly to the regulation of intoxicating liquor as being violative, is broader in scope than the Liquor Control Acts of most states. However, we are cited no cases which we believe would serve as a basis for holding such treatment unconstitutional. In view of the broad authority in supervising the regulation of intoxicating liquor, long vested in the legislature of the state; we have no hesitancy in affirming the constitutionality of the provisions of the Private Club Act as interpreted herein.

In the case of *Nick Plainos v. The State,* 131 Texas Crim. Rep. 516, 100 S. W. 2d 367, the Texas Court of Criminal Appeals commented as follows:

". . . No case has been found which holds that a statute is unreasonable which requires one licensed to deal in such liquors to submit to an inspection of his licensed premises. . . ." (pp. 517, 518.)

The broad power of Congress in designing powers of inspection under federal liquor laws was noted in the recent case of *Colonnade Corp. v. United States,* 397 U. S. 72, 25 L. Ed. 2d 60, 90 S. Ct. 774, wherein it was said:

". . . We deal here with the liquor industry long subject to close supervision and inspection. As respects that industry, and its various branches including retailers, Congress has broad authority to fashion standards of reasonableness for searches and seizures. . . ." (p. 77.)

We next consider the contentions of defendant that the "consent" to the initial entrance and secondarily the "consent" by defendant in unlocking the inner closet of the club premises, wherein the subject slot machines were discovered, was in each instance something less than the consent constitutionally required to validate a warrantless search and seizure.

At this juncture we pause to emphasize that in this case we are dealing with an administrative entry and inspection of premises licensed under the Private Club Act—a part of the Kansas Liquor Control Act.

The evidence concerning the initial entrance is developed by the testimony of Willis Weigel, who opened the door, special agent

Maudlin and several other witnesses who observed the entrance.

When Wiegel opened the north door of the cocktail lounge, in response to the request of defendant, he saw the officers at the south door. Weigel motioned to the officers to come to the north door, his testimony appears as follows:

"Q. What happened when these gentlemen reached the door, did they show you an identification card?

"A. I had hold of the door, opening it, and they came walking up to the door, and one of them flashed a card and says, 'K. B. I., it is a raid,' and they all just rushed on by. One of them shoved me aside, and they came right in the door. I didn't have a chance to ask for anything."

Special agent Maudlin, who was the first to enter, denied physical contact with Weigel. Maudlin described the entry in this manner: "I identified myself and he stepped back, and we went through the door." Maudlin testified that the officers proceeded at a rapid pace, that they were not interested in liquor violations but were looking for gambling devices.

The trial court did not find the entry to be "forcible" but rather labeled it as "coercive"—apparently reasoning that the entry was not affirmatively consented to by either Weigel or defendant and that the simultaneous entry by four law officers constituted such a show of force that the lack of resistance by Weigel constituted only peaceful submission to a law force with apparent power to do as it willed. We can understand the trial court's reasoning in using the term "coercive" in evaluating the entry described. While the manner in which the officers entered the club premises cannot be considered as example of exemplary police conduct; nevertheless, we are unable to find that the entry here offends the concept of consent deemed to be conclusively given for immediate entry by any peace officer upon the acceptance of a private club license.

Although there is some dispute as to physical contact between Weigel and Maudlin, the most that can be said of it is that Weigel either stepped aside or was brushed aside by Maudlin, as the officers passed through the doorway. Weigel was not forced or manhandled out of the doorway, nor did he say anything that could be construed as negating consent to entrance by the officers. We believe the entry here can best be described as an acquiescence with or submission to lawful authority which we believe falls within the realm of the consent to immediate entry as a condition of licensing, as contemplated by the legislature. Mr. Weigel could have elected

to slam the door or block the doorway with his person at the risk of license revocation. The hard choice left to him may well be considered "coercive" but this is a risk undertaken by the acceptance of a license to operate as a private club. Consent to enter, by the terms of 41-2613, is to be measured against a refusal. Consent to enter was given by the statute, affirmative consent by Weigel was unnecessary, as will be shown later. There is no evidence of anything said or done by Weigel that could be construed as a refusal necessitating an entry by force on the part of the officers. The door was not forced, it was voluntarily opened by Weigel. He did not attempt to block the doorway or resist entrance by the officers. Measurement of consent in terms of an "intentional relinquishment or abandonment of a known right or privilege" ordinarily required to justify a warrantless search is not essential where consent is expressly given by the acceptance of a private club license. Cases bearing on the point will be discussed in conjunction with our consideration of defendant's consent in unlocking the slot machine compartment.

Lieutenant Derrell L. Schooler, a member of the raiding party, accompanied by defendant Dailey searched the game room. The discovery of the slot machines was described by defendant in his testimony as follows:

"Q. Now, you testified that later, in response to a request, you opened certain items in the game room?

"A. Yes, sir.

"Q. What did you open?

"A. Opened the roll-down curtains, or metal curtains, just like a garage door—it isn't a garage door, but it is a—I would refer to it as a rollup curtain steel door.

"Q. That was locked?

"A. Yes, sir.

"Q. And I think you testified you had to go to the cash register and get the key for that?

"A. True.

"Q. Did you refuse to open that?

"A. No, sir.

"Q. Opened it at their request?

"A. Yes, sir.

"Q. And behind that I think you said there were four slot machines?

"A. That's right, sir.

"Q. At any time did you refuse to talk to them or ask them to leave the club?

"A. No, sir.

"Q. At any time did you refuse to open any item they asked you to open?

"A. No, sir.

"Q. At any time did you advise them that you did not wish to talk to them, that you wished to talk to an attorney?

"A. No, sir.

"Q. In fact, you were very cooperative, were you not?

"A. Well, it was the KBI, and it is the law, and it says right on the liquor license you can't refuse an officer, a peace officer, and I try to comply with the rule.

"Q. You treated them like you have any other officers that have been in that club?

"A. That is true."

The trial court characterized defendant's lack of resistance as constituting only peaceful submission to the authority of an officer as distinguished from an understanding and intentional waiver of a constitutional right. Based upon this reasoning the trial court concluded that "defendant's Fourth Amendment rights and his rights under Article Fifteen of the Kansas Bill of Rights were violated by this search."

A problem confronting the trial court, as well as this court on review, arises from the fact that the state elected to prosecute defendant Dailey for gambling offenses under the criminal code, rather than proceeding under one of the several enforcement procedures provided by the Private Club Act. Our task is further complicated by the fact that the search and seizure here must not only be measured by the safeguards of Section Fifteen of our Kansas Bill of Rights, but also, by reason of the mandate of *Mapp v. Ohio*, 367 U. S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 84 A. L. R. 2d 933, reh. den. 368 U. S. 871, 7 L. Ed. 2d 72, 82 S. Ct. 23; and *Ker v. California*, 374 U. S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623, against the ins and outs of federal rules pertaining to search and seizure since the decisions referred to imposed upon state prosecutions the mandate of federal interpretations of the Fourth Amendment to the Constitution of the United States. (*State v. Wood*, 190 Kan. 778, 378 P. 2d 536.)

Since our reports are devoid of comparable cases dealing with administrative inspections, the trial court relied primarily on federal decisions. We must do likewise on appeal.

The trial court in its decision and the defendant on appeal relied heavily on the cases of *Colonnade Corp. v. United States,* supra; *See v. City of Seattle,* 387 U. S. 541, 18 L. Ed 2d 943, 87 S. Ct. 1737; and *Camara v. Municipal Court,* 387 U. S. 523, 18 L. Ed. 2d

930, 87 S. Ct. 1727, all of which deal with administrative entries and inspections.

*Colonnade* involved a federally licensed intoxicating liquor dealer, who refused entry to a locked room wherein illegally bottled liquor was kept. A government agent broke the lock and seized the liquor. A divided court upheld Colonnade's suit to obtain the return of the seized liquor and to suppress it as evidence. The thrust of the majority holding in Colonnade is that since Congress had selected a standard making it an offense for a licensee to refuse admittance to an inspector a forcible entry (breaking the lock) could not be condoned. In the case at bar, the lock was not broken, defendant testified that he willingly went to the cash register, obtained the key and unlocked the slot machine compartment.

The *Camara* and *See* cases involved refusals of warrantless administrative entries into respectively; a private apartment and a commercial warehouse. The premises in neither case was licensed, thus consent to entrance and inspection by acceptance of a license was not a factor in either decision.

Subsequent to the oral argument in this appeal the three foregoing cases have been superseded with respect to administrative entry and inspection of licensed premises by the recent pronouncement concerning the subject in *United States v. Biswell* [May 15, 1972], 40 U. S. Law Week, p. 4489, _____ U. S. _____, 32 L. Ed. 2d 87, 92 S. Ct. 1593.

Biswell had a federal license under the Federal Gun Control Act (18 U. S. C. § 923 [g]) for dealing in sporting rifles, etc., but did not have a license required by the act for dealers in gangster type weapons—sawed-off rifles, machine guns, etc. Biswell was visited by a U. S. Treasury Department agent who requested inspection of Biswell's gun storerooms. Biswell inquired if the agent had a warrant. The agent replied "no" but advised Biswell the Gun Control Act authorized the inspection and showed Biswell a copy of the law. Biswell examined the copy of the law and replied: "Well, that's what it says so I guess it's okay." Biswell then unlocked the storeroom and the agent found two sawed-off rifles, which Biswell was not licensed to possess. Biswell was indicted, his motion to suppress was denied and he was convicted. He appealed to the Tenth Circuit Court of Appeals (*United States v. Biswell*, 442 F. 2d 1189) claiming that his acquiescence in the

search was not voluntary. The Circuit Court of Appeals, relying largely on *Colonnade, See,* and *Bumper v. North Carolina,* 391 U. S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788, reversed the conviction holding that entry without a warrant and without the owner's permission was unconstitutional and that the evidence seized must be suppressed.

On certiorari, the United States Supreme Court reversed and speaking through Justice White said:

"Here, the search was not accompanied by an unauthorized force, and if the target of the inspection had been a federally licensed liquor dealer, it is clear under *Colonnade* that the Fourth Amendment would not bar a seizure of illicit liquor. When the officers asked to inspect respondent's locked storeroom, they were merely asserting their statutory right, and respondent was on notice as to their identity and the legal basis for their action. Respondent's submission to *lawful* authority and his decision to step aside and permit the inspection rather than face a criminal prosecution is analogous to a householder's acquiescence in a search pursuant to a warrant when the alternative is a possible criminal prosecution for refusing entry or a forcible entry. In neither case does the lawfulness of the search depend on consent; in both, there is lawful authority independent of the will of the householder who might, other things being equal, prefer no search at all. . . ." (40 U. S. Law Week, pp 4490-4491.)

Futher in the opinion this statement appears:

". . . When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms and ammunition will be subject to effective inspection. . . ." (40 U. S. Law Week, p. 4491.)

Defendant Dailey, as did Biswell, unlocked the slot machine compartment because he thought it was necessary under the provisions of the Private Club Act. Weigel's conduct at the initial entrance was found by the trial court to be submission to lawful authority, similar conduct of Biswell was given the same label.

There is no contention here that defendant did not stand in the same position as a licensee.

In the case at bar, the officers were merely asserting their statutory right, both Weigel and defendant were on notice as to the officers' identity and the legal basis for their action. As in *Biswell,* the consent given by the licensee in accepting a license under the act established lawful authority independent of the will of the licensee. Thus, affirmative consent is not required; acquiescence or cooperative submission, as in this case, is sufficient. This is not to say that officers can use any appreciable force to gain entry when

confronted with a refusal, which is an option of a licensee. The act affords the remedy of license revocation in such a circumstance.

It should be noted that the trial court did not have the benefit of the opinion in *Biswell* at the time it rendered judgment herein.

For the reasons stated we hold that the submission of Weigel and the willing cooperation of defendant constituted consent within the contemplation of 41-2613, *supra;* that the search was not forcible and that the seizure of the subject slot machines was reasonable and lawful.

By the provisions of 41-2611 (*e*) and 41-2610 (*b*) gambling is specified as a violation of the act. Gambling is also a crime under the Kansas Criminal Code if the particular activity is within the definitions of K. S. A. 1971 Supp. 21-4302, *et seq.* In fact, reference to the criminal code is necessary in order to ascertain whether an activity is gambling under the Private Club Act. For the purposes of this case, it is undisputed that slot machines are gambling devices *per se.* As previously noted, the defendant is charged with gambling offenses under the criminal code, rather than with violations of the Private Club Act under K. S. A. 1971 Supp. 41-2633. However, the consent of defendant is effective with respect to the lawfulness of the search and seizure, whether the prosecution be under the criminal code or the Private Club Act. (See *Clark v. State*, [Texas Crim. App., 1969], 445 S. W. 2d 516, and cases cited therein.) The lawfulness of the search and the seizure of the gambling evidence is the only issue presented in this appeal—on the ground the supression of the evidence involved was erroneous. What other aspects of the evidence, if any, concerning its admissibility in the prosecution of defendant are not before us for determination.

The appeal is sustained and the cause is remanded for further proceedings.

PRAGER, J., (dissenting): I respectfully dissent from the holding of the majority of the court that the search conducted in this case was a reasonable search within the meaning of the Fourth Amendment to the United States Constitution and Section 15 of the Bill of Rights of the Kansas Constitution. I have no quarrel with the general principles of law discussed by Mr. Justice Kaul in the majority opinion. I disagree with the application of those

principles to the particular facts and circumstances presented in the record in this case.

What is a reasonable search is not to be determined by any fixed formula. Neither the United States Constitution nor the Kansas Constitution defines what are "reasonable searches." The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. (*United States v. Rabinowitz*, 339 U. S. 56, 94 L. Ed. 653, 70 S. Ct. 430; *State v. Wood*, 197 Kan. 241, 416 P. 2d 729; *State v. Caldrone*, 205 Kan. 828, 473 P. 2d 66.)

The decisions of the federal courts in the area of search and seizure draw thin lines of distinction which are difficult to comprehend. We are, of course, vitally concerned with the decisions of the United States Supreme Court in this area. But we have an equal obligation to enforce the constitutional guaranties of the Kansas Constitution in cases which arise within our own territorial borders. I recognize the great public interest in the regulation of the liquor traffic and the necessity for comprehensive inspection procedures as a part of our statutory scheme of regulation. It is also clear that the regulation of private clubs which dispense liquor justifies frequent and irregular inspections as authorized by K. S. A. 1971 Supp. 41-2613. The legislature in providing to police officers the right to inspect private clubs has recognized the obvious fact that liquor, gambling and prostitution are frequent companions. Hence it is clear to me that the constitutional protections against unreasonable searches do not prohibit the right of immediate entry and inspection at any time of premises licensed as a private club to sell liquor as provided by K. S. A. 1971 Supp. 41-2613.

The constitutional protection against unreasonable searches applies not only to the homes of our citizens but is also extended to apartments, hotel rooms, factories and business establishments. It likewise is extended to private clubs such as social, fraternal and veterans organizations where many of our citizens spend portions of their recreational hours.

The law is also clear that in determining whether or not a search is reasonable courts are obligated to consider not only the question whether or not a search was authorized at all but also the manner in which the search was conducted. A search otherwise legal except for the unreasonable way in which it is conducted,

as for instance by the use of excessive and unnecessary force or brutality, is unreasonable and therefore a violation of both the state and federal constitutions. (*State v. Collins,* 150 Conn. 488, 191 A. 2d 253; 47 Am. Jur., Searches and Seizures, § 41.) Whether the conduct of the officer making the search is reasonable or unreasonable must be determined from all of the circumstances of the case. No definite line can be drawn. The general principle is that while officers should search thoroughly, they should also act in a reasonable way and not conduct the search in a manner which is drastic, intrusive, and unduly disturbing to the primary objects of the club. (*Manchester Press Club v. Commission,* 89 N. H. 442, 200 A. 407, 116 A. L. R. 1093.) Even in the execution of a valid search warrant only *necessary* and *reasonable* force may be used to effect an entry into a building or property. (K. S. A. 1971 Supp. 22-2508.)

In his dissenting opinion in *Brinegar v. United States,* 338 U. S. 160, 93 L. Ed. 1879, 69 S. Ct. 1302, Mr. Justice Jackson pointed out the dangers inherent in warrantless searches in the following language:

"We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit. We must remember, too, that freedom from unreasonable search differs from some of the other rights of the Constitution in that there is no way in which the innocent citizen can invoke advance protection. For example, any effective interference with freedom of the press, or free speech, or religion, usually requires a course of suppressions against which the citizen can and often does go to the court and obtain an injunction. Other rights, such as that to an impartial jury or the aid of counsel, are within the supervisory power of the courts themselves. Such a right as just compensation for the taking of private property may be vindicated after the act in terms of money.

"But an illegal search and seizure usually is a single incident, perpetrated by surprise, conducted in haste, kept purposely beyond the court's supervision and limited only by the judgment and moderation of officers whose own interests and records are often at stake in the search. There is no opportunity for injunction or appeal to disinterested intervention. The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence.

"And we must remember that the authority which we concede to conduct searches and seizures without warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible, and resorted to in case of petty misdemeanors as well as in the case of the gravest felonies." (p. 182.)

I would hold the search conducted in the case at bar unreasonable for the reason that the right of police officers to make a reason-

able inspection under a licensing statute does not justify police over-kill.

The motion to suppress in this case was heard in a full evidentiary hearing provided by one of the able trial judges of Kansas. His findings of fact are supported in the record by substantial competent evidence and are as follows:

1. The search had probably been planned for more than one day.

2. It was one of eight Barton County clubs scheduled for and subjected to simultaneous searching.

3. Eight of the total group of thirty or more law officers at one time or another took part in searching this club.

4. It was under the specific direction and instruction of the attorney general.

5. None of the eight law officers were instructed that it was an inspection authorized by the Alcoholic Beverage Control Act.

6. None of the eight law officers believed that they were operating under the authority of that act.

7. The officers were generally not knowledgeable about inspections made under authority of that act.

8. It was not an "inspection" as that word is used in the Alcoholic Beverage Control Act.

9. All eight of the officers considered that they were just to conduct a gambling raid.

10. The officers conducted a gambling raid, nothing more or less.

11. The officers expected to find gambling equipment.

12. No search warrant was obtained.

13. No attempt was made to obtain a search warrant.

14. Judicial personnel were readily available to issue a search warrant.

15. The obtaining of a search warrant would have worked no substantial inconvenience to the officers.

16. The officers had adequate time to have obtained a search warrant.

17. Entry was made to conduct a gambling raid.

18. Entry was made in the middle of the night.

19. The simultaneous entry by four law officers constituted a show of force.

20. Entry was made with law officers bearing sidearms.

21. Entry was not consented to by either the doorman or the defendant.

22. The entry was coercive.

23. Lack of resistance by the doorman and the defendant constituted only peaceful submission to a law force with apparent power to do as it willed.

24. This club was subject to the restrictions imposed by the Alcoholic Beverage Control Act.

25. This club possessed gambling equipment which was seized.

At the time of the oral argument the attorney general admitted with commendable candor that a search warrant was not obtained for the reason that he had no probable cause or evidence sufficient to obtain the same from a magistrate.

I would have no complaint if a police officer had gone to the American Legion Club and exercised his right of entry to make a reasonable inspection in a dignified, firm but unobstrusive manner. I would have no objection if, while there, he had exercised his right to inspect closed storage lockers including the area where the slot machines were located. I do object to the subjection of the members of the club and the club manager to a showy, obtrusive and disruptive raid which went far beyond the bounds of a reasonable inspection as authorized by the Alcoholic Beverage Control Act. We have many statutes and city ordinances in Kansas which authorize reasonable inspections of business establishments which are subject to licensing regulations. For example, every place of business licensed to sell cereal malt beverages is required to be open to the police during business hours. (K. S. A. 1971 Supp. 41-2704.) Every restaurant licensed to sell food may be inspected at any or all reasonable times. (K. S. A. 36-304.) Likewise every hotel and apartment house is subject to being inspected with a right of entry and access thereto at any reasonable time given to inspectors of the state hotel and restaurant board. (K. S. A. 36-108.) It should also be noted that all books and records of persons engaged in the business of selling property and subject to the retailers' sales tax must be available for and subject to inspection at all times during the business time of the day by the Director of Revenue or his agents or employees. (K. S. A. 79-3609.)

In all cases involving a search of private premises we are faced with the problem of drawing a reasonable line between the individual's right to privacy and the public's interest in the prevention of crime and the apprehension of criminals. Were we to hold that in every instance in which a license may lawfully be required its granting may at the same time be conditional upon a waiver of constitutional rights against unreasonable search, what area could conceivably remain immune and beyond legislative reach, upon which the constitutional guaranty might still operate? It might be said that no legislature would go so far as to dry up the entire stream of constitutional immunity. But it is not the genius of our system that the constitutional rights of persons shall depend for their efficacy upon legislative benevolence. Rather, the courts are charged with the solemn obligation of erecting around those rights, in adjudicated cases, a barrier against legislative and executive invasion. It is the responsibility of the courts to breathe the breath

of life into constitutional rights, mandates, guaranties and limitations in the very face of contravening legislation or executive action. (*People v. Lansing Municipal Judge,* 327 Mich. 410, 42 N. W. 2d 120.)

From what has been said it seems clear to me that under the particular facts and circumstances of this case the police power was exercised in a manner going far beyond the reasonable inspection of a private club as contemplated by the legislature in K. S. A. 1971 Supp. 41-2613.

I would hold that the police raid conducted in the manner in which it was done here constituted an unreasonable search in violation of the constitutional protections provided by the United States Constitution and the Constitution of Kansas. I would affirm the decision of the trial court.

FROMME, J., joins in the foregoing dissent.