# Fourth Amendment Issues Raised by Chemical Weapons Inspection Regime

The inspection regime to be created by the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction and by the proposed Chemical Weapons Implementation Act, under which inspections of facilities that produce certain chemicals would occur, absent exigent circumstances, only after the United States Government obtained the consent of the owner or operator of the facility, an administrative warrant, or a criminal search warrant, is consistent with the Fourth Amendment to the Constitution.

September 10, 1996

STATEMENT BEFORE THE SUBCOMMITTEE ON THE
CONSTITUTION, FEDERALISM, AND PROPERTY RIGHTS OF THE
SENATE COMMITTEE ON THE JUDICIARY

I appreciate being given the opportunity to address this Subcommittee on the Fourth Amendment Issues raised by both the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction (the "Convention" or "CWC") and the Chemical Weapons Implementation Act (the "Act") currently before Congress.

The Senate, with respect to the Convention, and the Congress, with respect to the Act, now have the opportunity to contribute to the world-wide effort to eliminate the scourge of chemical weapons. Ratification of the Convention and passage of the Act also will represent positive steps towards the goal of reducing the threat posed by terrorists, a goal shared by the President and the Congress. Before I discuss specific aspects of the inspection regime established under the Convention and the Act, and the application of the Fourth Amendment thereto, I think it is important to remind the Subcommittee that the commitment to achieving a global ban on chemical weapons, and to doing so within our constitutional framework, has been a bipartisan one. Negotiations on the Convention commenced during the Administration of President Reagan; the Convention was signed under President Bush. President Clinton is fully pledged to ratification of the Convention and enactment of the implementing legislation.

We have reviewed this Convention and this Act and have concluded that the inspection regime they would create will not compromise the guarantees of the Fourth Amendment. The right of the people to be free from unreasonable searches and seizures, as much as any specific provision of the Constitution, represents a check on the power of government. At the same time, the Fourth Amendment stands as a solemn declaration of the right to conduct one's affairs in private. Over eighty years ago, the Supreme Court observed that the duty of giving force and effect to the Fourth Amendment "is obligatory upon all entrusted under our Federal system with the enforcement of the laws." *Weeks v. United States*, 232

310

U.S. 383, 392 (1914). This Administration, the Department of Justice, and I have an abiding conviction in this principle.

Both the Convention and the Act have been painstakingly drafted to put in place an effective, verifiable ban on the development, acquisition, and use of chemical weapons. But none of their provisions in any way contemplates or permits conduct in contravention of the Fourth Amendment. Indeed, the inspection provisions were drafted to be fully consonant with the dictates of search and seizure law.

To ensure compliance with the CWC prohibitions and requirements, the Convention and its implementing legislation would permit two types of verification inspections: routine (which will apply to three Schedules of chemicals) and challenge. I will address each type of inspection in turn.

*Routine Inspections.* All facilities, both public and private, that are "declared" as producing scheduled chemicals as set forth under the CWC would be subject to routine inspections. The Technical Secretariat of the CWC's Organization for the Prohibition of Chemical Weapons ("OPCW") would select such facilities for inspection based on neutral and objective criteria. The purpose of the routine inspection is strictly limited: to determine the accuracy of declarations and to determine whether activities are in accordance with CWC obligations. Other than those facilities that produce the very restricted amounts of chemicals set forth under Schedule 1, no declared facility would be subject to routine inspection more than twice a year.

As an initial matter, the Administration anticipates that most inspections — routine and challenge — will be conducted with the consent of the owner or operator of the facility at issue. It is important to keep in mind that the chemical manufacturing industry itself strongly supports the ratification and implementation of the CWC and its verification inspection scheme. Where available, the specifics of these inspections will be dictated by facility agreements entered into between the U.S. Government and the OPCW. If consent were to be denied, however, absent exigent circumstances, the U.S. Government would seek an administrative warrant to inspect a specific facility.

This inspection scheme is fully consistent with Fourth Amendment principles. The Fourth Amendment requires that "subject only to a few specifically established and well-delineated exceptions," *Katz v. United States*, 389 U.S. 347, 357 (1967), searches and seizures conducted in the absence of "a judicial warrant issued upon probable cause and particularly describing the items to be seized" are per se unreasonable. *United States v. Place*, 462 U.S. 696, 701 (1983). The Fourth Amendment's warrant and probable cause requirements do not apply to a particular search, however, when the party to be searched provides consent. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). I thus would emphasize that the warrant provisions under the CWC and its implementing legislation would

apply only to the small minority of inspections as to which consent might be withheld.

The Fourth Amendment's prohibition on unreasonable searches and seizures applies to administrative searches of private commercial property. *See See v. City of Seattle*, 387 U.S. 541, 543–44 (1967). The expectation of privacy in commercial premises, however, is less than the similar expectation in one's home. *See id.* at 545–46. For purposes of an administrative search, "probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'" *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978) (footnote omitted) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)). With respect to closely regulated industries, the Supreme Court has held that "[t]his expectation is particularly attenuated." *New York v. Burger*, 482 U.S. 691, 700 (1987).

In part due to the extensive environmental, health, and safety issues inherent in its activities, the chemical manufacturing industry is already subject to pervasive governmental regulation. The Resource Conservation and Recovery Act, the Toxic Substance Control Act, the Clean Air Act, and the Clean Water Act, to a greater or lesser degree, apply to most of the U.S. facilities that will be declared under the CWC. Through ratification of the CWC and enactment of its implementing legislation, the chemical manufacturing industry similarly would be subject to their regulatory scheme. To ensure compliance with its terms, the CWC and the Act provide for " 'reasonable legislative or administrative standards for conducting an . . . inspection.' " *Barlow's*, 436 U.S. at 320 (quoting *Camara v. Municipal Court*, 387 U.S. at 538). All facilities that would be subject to routine searches under the CWC are part of this industry, and would be declared under the CWC and thus on notice that routine inspections would take place. For these facilities, there would be sufficient basis for obtaining administrative search warrants to conduct verification inspections where consent is denied. In those cases, a warrant would be sought prior to initiation of an inspection, in the absence of exigent circumstances.

*Challenge Inspections.* The second type of inspections are the challenge inspections. If a State Party makes a specific allegation of non-compliance, it may request that the suspect facility be made subject to a challenge inspection, whether or not that facility was declared.

Declared facilities selected for a challenge inspection would be subject to inspections in the same manner as provided under the CWC and the Act for routine inspections: pursuant to either consent or an administrative search warrant. Facilities that are undeclared, however, likely would not fall within the closely regulated industry of chemical manufacturing. Therefore, the government may not be able to obtain administrative search warrants to conduct such inspections. Instead, for

the small number of undeclared facilities where consent to inspect is denied, and where an administrative warrant is unobtainable, the Fourth Amendment, in the absence of exigent circumstances, may require that a criminal search warrant be secured. This warrant would be based on probable cause to believe that a violation of the Act or Convention has been or is being committed.

In certain instances, insufficient evidence may exist to establish criminal probable cause within the meaning of the Fourth Amendment. Thus, a search warrant would be unobtainable. The CWC anticipates this possibility and would not force a choice between compliance with its terms, and adherence to our constitutional principles. Rather, the Convention specifically allows the U.S. Government, in granting access to facilities identified for challenge inspections, to "tak[e] into account any constitutional obligations it may have with regard to proprietary rights or searches and seizures." *See* Verification Annex of the CWC, pt. X, para. C.41. Hence, in the rare event that the Fourth Amendment would pose a bar to a search of premises identified for a challenge inspection and the inspection could not go forward, the United States would remain in full compliance with its obligations under the CWC.

*Issuance of Warrants.* Next, I would like to discuss specifically how warrants would be issued under the Act. Once the Lead Agency representing the U.S. Government provides sufficient information to support a finding of administrative probable cause, the Act directs the authorized official to issue promptly a search warrant authorizing the requested routine or challenge inspection. To demonstrate probable cause for an administrative warrant, the government must submit an affidavit stating that the CWC is in force for the United States; the facility to be inspected is subject to the specific type of inspection requested by the OPCW; the procedures established under the CWC and the Act for initiating the inspection have been complied with; and the Government will undertake to ensure that the inspection is conducted in a reasonable manner, not to exceed the scope or duration set forth in, or authorized by, the CWC and the Act. In turn, the administrative warrant must specify the type of inspection authorized and its purpose; the type of facility to be inspected and its location; the items, documents, and areas that may be inspected; the commencement and concluding dates and times of the inspection; and the identities of the representative of the Technical Secretariat of the OPCW, and of the representatives of the Lead Agency.

*Additional Protections.* The inspection regime set forth in the Act contains a number of provisions designed to protect individual rights. Written notice must be provided to the owner and to the operator, occupant, or agent ("operator") in charge of the premises to be inspected. The notice must be submitted to the owner or operator as soon as possible after the U.S. Government receives it from the Technical Secretariat. The notice must include all appropriate information supplied by the Technical Secretariat regarding the basis for the selection of the facility. For challenge inspections, this notice will specify the nature and circumstances

of the alleged non-compliance, as well as all appropriate information serving as the basis for the challenge.

In addition, the Act provides that if an owner or operator of the premises is present, a member of the inspection team and the U.S. Government representative must present appropriate credentials. Consistent with the time frames set forth in the CWC, each inspection must commence and be completed promptly. The time, scope, and manner of the inspection must be reasonable. To the extent possible consistent with the CWC, no inspection may extend to financial, sales and marketing (other than shipment), pricing, personnel, research, or patent data, or data maintained for compliance with environmental or occupational health and safety regulations.

Under the CWC and the Act, facility agreements must be concluded for all Schedule 1 facilities, and for Schedule 2 facilities, unless the owner or operator of the premises and the Technical Secretariat concur that such an agreement is unnecessary. The owners or operators of Schedule 3 facilities and other chemical production facilities subject to inspection under the CWC have the option of requesting a facility agreement if they so desire. The Act provides that, if a request is made, the U.S. Government should negotiate and conclude a facility agreement. The owner or operator shall have the right, to the extent practicable consistent with the obligations of the United States under the CWC, to participate in the preparation for, and observe the negotiation of, this agreement.

If the U.S. Government has signed a facility agreement with the OPCW governing a particular facility, any routine inspection of that facility must be conducted in accordance with such agreement. Because these agreements will establish detailed procedures that will control the conduct of inspections of affected facilities, the agreements will encourage owners and operators to consent to an inspection and grant access to their facilities.

In my opinion the Chemical Weapons Convention and the Implementation Act reflect a supreme effort and an extraordinary accomplishment. A measurable step has been taken to make the world a safer place in which to live and, at the same time, the principles set forth in the Fourth Amendment of the U.S. Constitution have been scrupulously observed. I would thus urge the Senate to consent to ratification of the Convention and Congressional passage of the Act.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*