[Cite as *N. Canton Dept. of Dev. Servs. v. CF Homes, L.L.C.*, 2025-Ohio-522.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| DEPT. OF DEVELOPMENT SERVICES FOR THE CITY OF NORTH CANTON OHIO, | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | Hon. Andrew J. King, J. |
| Plaintiff - Appellee | : | |
| | : | |
| -vs- | : | |
| | : | |
| CF HOMES LLC, | : | Case No. 2024CA00108 |
| | : | |
| Defendant - Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark County Court of Common Pleas, Case No. 2023CV01178

JUDGMENT: Affirmed

DATE OF JUDGMENT: February 14, 2025

APPEARANCES:

For Plaintiff-Appellee

OWEN J. RARRIC
WAYNE A. BOYER
KYLE W. REA
Krugliak, Wilkins, Griffiths,
& Dougherty Co., L. P.A.
4775 Munson St. NW/P.O. Box 36963
Canton, Ohio 44735

For Defendant-Appellant

MAURICE A. THOMPSON
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215

THOMAS W. CONNORS
Mendenhall Law Group
190 N. Union St., Suite 201
Akron, Ohio 44304

*Baldwin, P.J.*

{¶1} Appellant CF Homes, LLC appeals from the trial court's decision denying its motion for summary judgment, granting summary judgment to appellee Dept. of Development Services for the City of North Canton, Ohio, and finding that there was probable cause to issue an administrative warrant authorizing the appellee to inspect the appellant's rental property located at 914 North Main Street, North Canton, Ohio.

### STATEMENT OF THE FACTS AND THE CASE

{¶2} On April 18, 2022, the North Canton Committee of the Whole conducted a meeting in order to discuss and consider a new ordinance for inclusion in the Codified Ordinances of North Canton establishing Chapter 703, Registration of Rental Units. The stated purpose of the proposed Chapter was to establish a registry of rental units so the city could ensure that properties rented within the city limits complied with certain safety issues such as the presence of smoke detectors, carbon monoxide detectors, and other safety measures. The measure was passed, and Chapter 703 became part of the city's Codified Ordinances.

{¶3} Section 703.01 set forth the purpose of the chapter, which was "to hold all property owners and agents to the same property maintenance standards as set forth in Part 17 [the Property Maintenance Code] of the Codified Ordinances of the City of North Canton and to provide a safe and sanitary environment for the residents and their guests of all rental dwelling units." A "rental unit" was defined in Section 703.02(b) as "any premises or portion thereof containing units being occupied, intended to be occupied, or designed to be occupied for residential purposes by a tenant or person in like

circumstances of a tenant such as the tenant (purchaser) of a land contract."[1] "Owner" was defined in subsection (d) as "any person, agent, operator, firm, or corporation having legal or equitable interest in the property; or recorded in the official records of the state, county or municipality as holding title to the property; or otherwise having control of the property, including the guardian of the estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a court."

**{¶4}** Section 703.03 was entitled Registration of Rental Units Required, and provided that any non-owner-occupied premises of eight or fewer units shall not be rented or occupied unless the owner holds a Rental License. Section 703.04(a) provided that any premises containing eight or fewer rental units shall be required to apply for and maintain a valid rental license. Section 703.04(b) provided that the application for a rental license required the owner of the property to provide the street address and unit number(s); the name, address, and contact information of the property owner; the name, address, and contact information of the agent or person in charge of the property if other than the owner; and, the nature and extent of use of occupancy.

**{¶5}** Section 703.04(c) provided that upon the filing of an application for a Rental License and payment of the applicable fee, the appellee shall conduct a general inspection of the rental unit and premises to ensure compliance with Part 17 of the Codified Ordinances, which contains the property maintenance code for the City of North Canton.

---

[1] References herein are to the version of the Codified Ordinances that was in effect at the time of the appellee's application for an administrative warrant.

{¶6}   Section 703.04(c)(4)(C) provided that "[i]f a property owner fails to schedule inspections for their property within thirty (30) days from the date the application for a Rental License is filed or declines to have the Rental Unit inspected the Director of Permits a) may obtain an order or warrant to inspect from a court of competent jurisdiction; or b) may issue the Owner a Six Month Rental License for that Rental Unit." While failure to comply with the provisions of Chapter 703 may give rise to civil penalties, the rental unit inspection process set forth therein did not provide for criminal penalties in the event of non-compliance.

{¶7}   The appellee sought to inspect the subject rental property owned by the appellant pursuant to Chapter 703, and provided the appellant with a copy of the City of North Canton Rental Unit Inspection Form which outlined a checklist of "inspection categories," and "details to be inspected" within each category. The complete checklist is as follows:

- Life Safety:
    - Are there working smoke detectors in each sleeping room?
    - Are there working smoke detectors outside each sleeping area door?
    - Is there a working carbon monoxide (CO) alarm?
    - Are all exits out of the building free of obstructions and able to be used?
    - Does each bedroom have a window that can be easily opened and large enough for emergency escape?
- Kitchen Facilities:

- Is there a kitchen sink?

- Are countertops and backsplashes free of decay, rust, and rot?

- Is the kitchen floor free from holes, decay, and trip hazards?

- Bathroom Facilities:

  - Is there at least one toilet; a lavatory sink; and either a bathtub or shower, or a combination of a bathtub and shower?

  - Are all plumbing fixtures in operating condition?

  - Is the toilet/urinal connected to cold potable water under pressure necessary for safe and sanitary operation?

  - Is the floor free from holes, decay, and trip hazards?

  - Are shower enclosure floors and walls in operating condition and free of holes, cracks, breaches, decay, rust, and rot?

- Water Supply and Waste Water Disposal:

  - Do all sinks, showers, and/or tubs have a hot water supply of at least 110 degrees Fahrenheit?

  - Are household waste pipes in operating condition and connected to a public sewer system or to an approved private disposal system?

  - Are sewer clean-out openings capped with an approved plug?

- Trash, Recyclable Goods, and Food Scraps:

  - Is the dwelling unit free of trash, recyclables, and food scraps?

  - Is there a durable, covered container outside for trash and food scraps?

- Is the exterior of the dwelling free from trash and litter?

- Are there any junk motor vehicles on the property?

- If pets are housed in the yard, is it clean of pet waste?

- Pests and Infestation:

  - Is the home free of visual evidence of pests such as cockroaches, ants, rats, mice, bats, etc.?

  - Is the home free of any visual evidence of bedbugs?

  - Does a licensed pest control operator take measures to address pests and infestation?

- Heating and Air Conditioning:

  - Is the heating equipment in operating condition and capable of maintaining a room temperature of at least $15^{\circ}$ F warmer that [sic] the outside temperature, but in no event lower that [sic] $68^{\circ}$F in each habitable room?

  - Is the refrigerated air in operating condition and capable of maintaining temperature of at least $15^{\circ}$ F cooler than the outside temperature, but in no event higher than $85^{\circ}$ F in each habitable room?

- Natural and Mechanical Ventilation:

  - Does every habitable room have at least one window or door on an outside wall that can be opened for fresh air?

  - Are bathrooms ventilated by a window that easily opens or by a fan that vents to the exterior of the building?

- Are clothes dryers vented to the exterior of the building?

- Lighting and Electricity:

  - Does each habitable room, bathroom, hallway, and stairway of the dwelling have at least one electric outlet or light fixture controlled by a wall switch?

  - Are all electrical circuits and outlets maintained and in operating condition?

  - Is the electrical panel box in safe and operating condition?

- Appliances:

  - Are appliances supplied by the owner in operating condition?

- Structural Conditions:

  - Are all structural members free of deterioration so they are capable of safely supporting dead and live loads?

  - Are exposed metal or wood surfaces protected with an application of paint or other weather-coating materials?

  - Is the home structurally sound with no obvious signs of deficiencies or unsafe conditions?

  - Is the home free of visual evidence of mold or mildew?

  - Is the roof maintained in operating condition, free from leaks, holes, charred or deteriorated roof materials, rotted wood, and any other unsafe conditions?

  - Are gutters and downspouts, if any, in operating condition and safely fastener?

- Do any windows have any broken or cracked glass?

- Are windows and doors sealed against drafts and moisture?

- Are interior walls, ceilings, doors and other surfaces free from peeling, chipping, flaking or abraded paint?

{¶8} The appellant refused to permit the appellee access to inspect the subject rental property. As a result, the appellant filed an Application for an Administrative Inspection Warrant for a rental inspection of the subject premises. The appellant filed a Verified Answer, as well as a Counterclaim in which it sought a declaration that the appellee's ordinance is constitutionally impermissible insofar as the appellee lacks probable cause for the administrative warrant.

{¶9} The parties filed respective motions for summary judgment. On June 20, 2024, the trial court issued a Judgment Entry in which it found that there were no genuine issues of material fact and found that, as a matter of law, the appellant's constitutional challenges to the appellee's ordinance were unsupported by applicable case law. The trial court further found that the appellee was entitled to judgment in its favor and was entitled to the administrative warrant sought in its application for inspection of the subject rental property.

{¶10} The appellant filed a timely appeal, and sets forth the following three assignments of error:

{¶11} "I. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT, WHICH SOUGHT TO MAINTAIN THE STRINGENCY OF THE OHIO CONSTITUTION'S "PROBABLE CAUSE" SAFEGUARD ESTABLISHED IN 1851."

{¶12} "II. THE TRIAL COURT ERRED IN GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND ISSUING A SEARCH WARRANT TO SEARCH OCCUPIED PRIVATE RESIDENCES WITHOUT TRADITIONAL "PROBABLE CAUSE" TO DO SO."

{¶13} "III. THE CITY'S WARRANT APPLICATION SHOULD HAVE BEEN DENIED BECAUSE IT IMPERMISSIBLE [sic] EXCLUDED TENANTS-OCCUPANTS FROM THE PROCESS."

{¶14} The appellant submits that the trial court erred in denying its motion for summary judgment, in granting the appellee's motion for summary judgment, and in finding that there was probable cause to issue the administrative warrant for the appellee's  inspection of the appellant's rental property. We disagree.

## STANDARD OF REVIEW

{¶15}  Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36. Accordingly, this Court reviews a trial court's award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105.

{¶16} Civ. R. 56(C) states in pertinent part: "Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... A summary judgment shall not be rendered unless it appears from such evidence or stipulation, and only from

the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Thus, summary judgment may be granted only after the trial court determines that: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317 (1977).

**{¶17}** As stated by this Court in *Infield v. Westfield Ins. Co.*, 2023-Ohio-1199 (5th Dist.): "It is well established that the party seeking summary judgment bears the burden of demonstrating no issues of material fact exist for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt*, 75 Ohio St.3d 280 at 293, 662 N.E.2d 264 (1996): "* * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no

evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ*, 37 Ohio St.2d 150, 309 N.E.2d 924 (1974)." *Id.* at ¶ 21.

## ANALYSIS

**{¶18}** The appellant's assignments of error are intertwined, and as such will be addressed together.

**{¶19}** The topic of administrative warrants was discussed by the United States Supreme Court in the seminal case of *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967). The appellant in *Camara* was challenging the right of a municipal health and safety official to inspect the premises in which the appellant was living. When he refused said official access to the premises to conduct an inspection, he was criminally charged. Although the case sub judice does not involve a criminal charge or criminal penalties, the Court's reasoning regarding health and safety inspections and administrative warrants is instructive:

> Unlike the search pursuant to a criminal investigation, the inspection programs at issue here are aimed at securing city-wide compliance with minimum physical standards for private property. The primary governmental interest at stake is to prevent even the unintentional development of

conditions which are hazardous to public health and safety. Because fires and epidemics may ravage large urban areas, because unsightly conditions adversely affect the economic values of neighboring structures, numerous courts have upheld the police power of municipalities to impose and enforce such minimum standards even upon existing structures. In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of these reasonable goals of code enforcement.

*Id.* at 535. The Court stated further:

. . . we think that a number of persuasive factors combine to support the reasonableness of area code-enforcement inspections. First, such programs have a long history of judicial and public acceptance. See *Frank v. State of Maryland*, 359 U.S., at 367—371, 79 S.Ct. at 809—811. Second, the public interest demands that all dangerous conditions be prevented or abated, yet it is doubtful that any other canvassing technique would achieve acceptable results. Many such conditions—faulty wiring is an obvious example—are not observable from outside the building and indeed may not be apparent to the inexpert occupant himself. Finally, because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy. Both the majority and the dissent in *Frank* emphatically supported this conclusion:

'Time and experience have forcefully taught that the power to inspect dwelling places, either as a matter of systematic area-by-area search or, as here, to treat a specific problem, is of indispensable importance to the maintenance of community health; a power that would be greatly hobbled by the blanket requirement of the safeguards necessary for a search of evidence of criminal acts. The need for preventive action is great, and city after city has seen this need and granted the power of inspection to its health officials; and these inspections are apparently welcomed by all but an insignificant few. Certainly, the nature of our society has not vitiated the need for inspections first thought necessary 158 years ago, nor has experience revealed any abuse or inroad on freedom in meeting this need by means that history and dominant public opinion have sanctioned.' 359 U.S., at 372, 79 S.Ct. at 811.

*Id.* at 536-537. Finally, the Court stated:

. . . Where considerations of health and safety are involved, the facts that would justify an inference of 'probable cause' to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken. Experience may show the need for periodic inspections of certain facilities without further showing of cause to believe that substandard conditions dangerous to the public are being maintained. The passage of a certain period without inspection might of itself be sufficient in a given situation to justify the issuance of warrant. The

test of 'probable cause' required by the Fourth Amendment can take into account the nature of the search that is being sought.' 359 U.S., at 383, 79 S.Ct. at 87 (Mr. Justice Douglas, dissenting).

Having concluded that the area inspection is a 'reasonable' search of private property within the meaning of the Fourth Amendment, it is obvious that 'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling. Such standards, which will vary with the municipal program being enforced, may be based upon the passage of time, the nature of the building (e.g., a multifamily apartment house), or the condition of the entire area, but they will not necessarily depend upon specific knowledge of the condition of the particular dwelling. It has been suggested that so to vary the probable cause test from the standard applied in criminal cases would be to authorize a 'synthetic search warrant' and thereby to lessen the overall protections of the Fourth Amendment. *Frank v. State of Maryland*, 359 U.S., at 373, 79 S.Ct. at 812. But we do not agree. The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant. Cf. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614. Such an approach neither endangers time-honored doctrines

applicable to criminal investigations nor makes a nullity of the probable cause requirement in this area. It merely gives full recognition to the competing public and private interests here at stake and, in so doing, best fulfills the historic purpose behind the constitutional right to be free from unreasonable government invasions of privacy. See *Eaton v. Price*, 364 U.S., at 273—274, 80 S.Ct., at 1468—1469 (opinion of Mr. Justice Brennan).

*Id.* at 538-539. This case does not involve an attempted warrantless search, nor does it involve criminal charges. Instead, a warrant procedure was outlined in the appellee's ordinance, and was followed by the appellee. The inspection sought by the administrative warrant was limited to the items set forth on the appellee's Rental Unit Inspection Form checklist, which was provided to the appellant in advance. The appellee's valid public interest justifies the intrusion contemplated, and as a result there is probable cause to issue a suitably restricted administrative warrant.

{¶20} The appellant focuses its argument on Article I, Section 14 of the Ohio Constitution, submitting that it offers more expansive protections than the Fourth Amendment to the United States Constitution. We disagree.

{¶21} The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article I, Section 14 of the Ohio Constitution contains a parallel provision to the Fourth Amendment of the Federal Constitution, and

provides that "[t]he right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized." Article I, Section 14 of the Ohio Constitution, which is nearly identical to the language contained in the Fourth Amendment, has been held to afford the same level of protection as the United States Constitution. *State v. Hoffman*, 2014–Ohio–4795, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234 (1997). These protections against unreasonable searches and seizures have been similarly interpreted and applied. Article I, Section 14 does not alter our analysis of the issues, nor does it alter our application of *Camara.*

**{¶22}** The stated purpose of the appellee's ordinance regarding the registration and inspection of rental properties was to establish a registry of rental units so that the city could ensure that properties rented within the city limits complied with certain safety issues, such as the presence of smoke detectors, carbon monoxide detectors, and other safety measures; to hold all property owners and agents to the same property maintenance standards as set forth in Part 17 of the Codified Ordinances of the City of North Canton; and, to provide a safe and sanitary environment for the residents and their guests of all rental dwelling units. These purposes are aimed at securing city-wide compliance with minimum physical safety standards for private property. The appellee's primary interest is to prevent even the unintentional development of conditions which are hazardous to the renting public's health and safety. This is important in the context of rental properties, as some landlords are not as conscientious about maintaining rental properties as owners who reside in the premises. Moreover, renters may be less inclined

to report infractions for fear of retribution from their landlords. The appellee's rental property inspection ordinance protects those tenants and ensures that all rental properties are held to the same standard as owner-occupied properties within the municipality. Furthermore, the appellee's inspections are confined to the inspection checklist form, which specifically delineates what may be examined in any rental property. Finally, while the ordinance may impose civil fines for failure to comply with the registration and inspection requirements of the ordinance, it provides for no criminal penalties for non-compliance.

**{¶23}** Although the facts in *State v Finnell,* 115 Ohio App.3d 583 (1st Dist. 1996), dealt with the imposition of criminal penalties stemming from the property owner's refusal to permit an inspection of his vacant property, and the lack of a procedure within the ordinance for obtaining a warrant, the court's comments on the issue of administrative warrants is instructive:

> Administrative entry by the government into premises may only be compelled within the framework of a formal warrant procedure. *See v. Seattle* (1967), 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943. Probable cause to issue an administrative warrant for entry into premises is the subject of a flexible standard of reasonableness given the agency's particular demand for access and the public need for effective enforcement of the regulation involved. *Id.* However, the United States Supreme Court declared: "But the decision to enter and inspect will not be the product of the unreviewed discretion of the enforcement officer." *Id.* Thus, a warrant may be issued to permit authorities to enter commercial premises as long

as the public need for effective enforcement of the regulation involved outweighs an owner's expectation of privacy, because under those circumstances, the expectation is no longer "reasonable."

*Id.* at 589. In this case, the appellee's need for effective enforcement of its rental property regulations in order to hold rental property owners to the same property maintenance standards established for owner-occupied properties as contained in Part 17 of the Codified Ordinances of the City of North Canton, and to provide a safe and sanitary environment for the residents and their guests of all rental dwelling units, is based upon reasonable concerns. The administrative warrant procedure is outlined in the ordinance in the event an owner refuses to allow the inspection, and the application of the administrative warrant is subject to an adversarial litigation procedure. The property owner is notified of the application for the administrative warrant, and is permitted to defend against it. There is no "unreviewed discretion of the enforcement officer" in this case, as the trial court ensures the reasonableness of the requested warrant.

**{¶24}** The court's decision in *Kaim Properties, LLC v. Mentor,* 2013-Ohio-4291 (11th Dist.) further supports this reasoning. In *Kaim,* the property owner appealed the decision of the trial court granting summary judgment in favor of the city of Mentor regarding the constitutionality of Mentor's rental housing maintenance code, which provided that rental properties be inspected in order to obtain a rental dwelling unit certificate. The property owner failed to obtain the certificate, violation notices were issued, and the matter was ultimately brought before the trial court, who granted summary judgment to the City of Mentor. The court of appeals affirmed, stating:

Finally, we disagree with Kaim's suggestion that the Rental Code is unconstitutional because it authorizes search warrants without probable cause. Section 1391.06 provides that if the property owner refuses consent to inspect, the "code official shall be permitted to seek, in a court of competent jurisdiction, a warrant for administrative inspection." Contrary to Kaim's suggestion, the Code does not authorize, either expressly or by implication, a search warrant without probable cause. The fact that the Code authorizes the inspector to seek a search warrant *from an appropriate court* implies that the applicant must establish probable cause in order to obtain a warrant. Further, it is well settled that the government can obtain a warrant for administrative inspections. *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320 (1987). For purposes of an administrative search, probable cause justifying the issuance of a warrant may be based on evidence of an existing violation or on a showing that reasonable legislative standards for conducting an inspection are satisfied. *Id.*

*Id.* at ¶40. In this case, the fact that the applicable ordinance authorizes procurement of a search warrant from an appropriate court implies that the appellee must establish probable cause in order to obtain the administrative warrant. Furthermore, it is well settled that a municipality may obtain a warrant for administrative inspections of properties, and probable cause may be based upon a showing that reasonable legislative standards for conducting an inspection are satisfied. Said standards were satisfied in this case.

**{¶25}** Finally, the fact that the appellee did not include tenants in its application for an administrative warrant does not proscribe the issuance of the warrant to inspect

the subject rental property and to ensure the appellant's compliance with the appellee's ordinances and property maintenance code. None of the enumerated circumstances in Civ.R. 19.1(A) apply to require a compulsory joinder in this case. Additionally, the appellant has advocated for the same privacy interest any tenants may proffer. The inspection permitted pursuant to the administrative warrant herein is not performed without notice, and must be confined to the parameters of the appellee's inspection checklist.

{¶26} The appellee's ordinance provides a definitive standard by which the administrative warrant may issue, and contains a clearly defined purpose. In addition, the inspection checklist provides very specific parameters by which the inspection may be completed. The appellant's assignments of error are, therefore, without merit.

**CONCLUSION**

{¶27} Based upon the foregoing, the appellant's assignments of error numbers one through three are overruled, and the decision of the Stark County Court of Common Pleas is hereby affirmed.

By: Baldwin, P.J.

Hoffman, J. concur

King, J. concurs separately.

*King, J. concurs separately,*

{¶ 28} I join the judgment of this court and do not disagree with the opinion written by Judge Baldwin. But I maintain doubt that the scheme created by North Canton is consistent with Section 14, Article 1 of the Ohio Constitution and the general laws of Ohio. Despite that doubt, I conclude that I must follow the precedent from the Supreme Court of Ohio in this matter. I explain this more fully as follows.

{¶ 29} Search warrants are most often obtained to secure evidence of a criminal violation. In addition, a search warrant may be issued for "administrative purposes." In the latter case, the warrant is issued to search a premise for the purposes of ensuring health, safety, and welfare. Because the purpose of the search is different than gathering evidence for criminal prosecution, the question courts must confront is whether the constitutional commands for reasonable searches and probable cause apply differently when the search is motivated by one concern or the other.

{¶ 30} For the last several decades, the answer to that question is they are indeed two different standards. It appears the first time this divergence was recognized was in *District of Columbia v. Little*, 178 F. 2d 13 (1941). In that case, Ms. Little refused to allow the health inspector into her house. The court of appeals found that there was no distinction between a search and inspection and found both subject to the Fourth Amendment. *Id.* 16-17. Although the Supreme Court of the United States upheld the decision, it expressly avoided the constitutional question in doing so. *District of Columbia v. Little*, 339 U.S. 1, 4 (1950).

{¶ 31} The Court returned to this question several years later in *Frank v. Maryland*, 359 U.S. 360 (1959). The lead opinion, authored by Justice Frankfurter, found that a

warrant was not needed for a sanitary inspection. *Id.* 373. Justice Douglas, joined by three other justices, wrote a vigorous dissent arguing that an evaluation of history showed the Fourth Amendment also applied outside of criminal contexts. *Id.* 377. He ended his dissent by noting England had a long-standing history of requiring a warrant for health inspections. *Id.* 384.

{¶ 32} This rule did not last long; the Court returned to this question in *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967). The Court noted that the district court relied on *Frank* and other state court cases in affirming a warrantless search by the municipality and reversed, explicitly overruling a number of cases. *Id.* 527-28. In holding that a warrant was required for this kind of search, the court determined the warrant could be issued upon either probable cause or "if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id.* 538. See also *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 321-322(1978) and *Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 622 (3d Cir. 1991).

{¶ 33} The need for probable cause, even if relaxed from the traditional sense that is used in criminal investigations, is plainly rooted in the text, history, and tradition of the Fourth Amendment and Section 14, Article 1 of the Constitution of Ohio. The history and tradition of a general section or provision (such as "probable cause") is often determinative when construing a constitution. *State v. Skaggs*, 2024-Ohio-4781, ¶62. (5th Dist.) (King, J., dissenting). But I question obviating probable cause altogether when the government establishes "legislative or administrative" standards. This appears to be both ahistorical and a late judicial fabrication.

{¶ 34} Despite any misgivings about extending this aspect of the holding of *Camara* to our state constitution, I believe we are obligated to affirm this case on the basis of stare decisis. Just prior to the decision in *Frank*, the Supreme Court of Ohio has the opportunity to review Section 14, Article 1. *State ex rel. Eaton v. Price*, 168 Ohio St 123 (1958). It concluded this:

> We, therefore, conclude that an ordinance establishing minimum standards 'governing utilities, facilities and other physical things and conditions essential to make dwellings safe, sanitary and fit for human habitation,' and 'governing the conditions and maintenance of dwellings,' and containing a provision which authorizes a housing inspector to make inspections of 'dwellings, dwelling units, rooming houses, rooming units and premises located within the city' and which also authorizes such inspector 'upon showing appropriate identification * * * to enter, examine and survey at any reasonable hour all dwellings' and which require that the 'owner or occupant of every dwelling' shall give such inspector 'free access to such dwelling * * * at any reasonable hour for the purpose of such inspection, examination and survey,' with penalties of fine or imprisonment or both for violation of such provision, is not violative of Section 14 of Article I of the Ohio Constitution prohibiting unreasonable searches and seizures.

{¶ 35} *Id.* 532-533. Although the Supreme Court of the United States cited to this case negatively in an attempt to distinguish the rule in *Camara* from what came before it, it did not—and could not—nullify its holding with respect to Constitution of Ohio. Accordingly, I concur in judgment to affirm the judgment of the trial court.